**STATE of Maine**

**v.**

**Theodore Max ALLARD.**

Supreme Judicial Court of Maine.

Dec. 27, 1973.

2. George Bernard Shaw, preface to, "Androcles and the Lion."

John Mitchell, County Atty., Machias, Charles K. Leadbetter Asst. Atty. Gen., Augusta, for plaintiff.

Brown, Tibbetts & Fletcher by Robert E. Tibbetts, Calais, for defendant.

Before DUFRESNE, C. J., and WEATH-ERBEE, POMEROY, WERNICK, ARCHIBALD and DELAHANTY, JJ.

WEATHERBEE, Justice.

Just before midnight on July 24, 1972 the Defendant and three companions drove across the International Bridge into the United States Customs area, a federal enclave at Calais. Feeling suspicious of the travelers' appearances a Customs official at this border crossing asked the four occupants to get out of their car and requested that the Defendant empty his pockets.[1] One of the objects taken from a pocket was a small aspirin tin. The officer picked up the tin, opened it, and discovered two aspirin tablets plus four small blue tablets, pieces of brown tablets and a razor blade. The officer took a small portion of one blue tablet and performed a field test on it to determine if the tablet contained D-lysergic acid diethylamide (LSD). The test was positive.

Following the test, the officer called a superior who directed the officer to call the local police, which he did. Next, the officer and a fellow Customs employee searched the vehicle and the other occupants. About an hour after the call was placed, an officer of the Calais Police arrived at the scene. The Customs officer explained the situation to the policeman, who then talked with the Defendant. Shortly thereafter, the policeman arrested the Defendant without a warrant, properly giving the Miranda warnings. The Customs officer turned over the tin and tablets to the policeman. The Defendant was charged with a violation of 22 M.R.S.A. § 2212–B,[2] illegal possession of LSD.

An indictment was returned by the grand jury of Washington County against the Defendant on the above charge. The Defendant filed a motion to dismiss the indictment, a supplemental motion to dismiss the indictment, and a motion to suppress illegally seized evidence. Hearings were held on these motions, all of which were denied by the Superior Court Justice. Because of the important questions involved, the Justice ordered an interlocutory report to the Law Court and stay of further proceedings under M.R.Crim.P., Rule 37A(b).

The questions of law justifying the report of this case to the Law Court are framed as follows:

"(1) Is the border station enclave manned by United States Customs agents at Calais under the exclusive jurisdiction of the United States Government?

(2) Did the Calais Police have authority to arrest Defendant on said enclave?

(3) If not, does this preclude prosecution by the State of Maine for the offense for which Defendant was arrested?

(4) Did the United States Customs officials have the right to turn over to the Calais Police property which they had seized from Defendant within the enclave for a Customs violation to be used as evidence in the instant criminal prosecution by the State of Maine?

---

1. The record shows that Customs officials often perform both primary and secondary examinations on incoming persons. The primary consists basically of asking the traveler for his citizenship, determining the length of his stay, and ascertaining if any goods from Canada have been purchased. If any suspicions are aroused, the officials then perform the secondary exam, which consists of physical examination of the occupants or the vehicle.

2. "Whoever . . . is in possession of certain hallucinogenic drugs shall upon conviction thereof be punished by a fine of not more than $1,000 or by imprisonment for not more than 2 years, or by both. Such hallucinogenic drugs shall include . . . D-lysergic acid diethylamide (LSD or LSD-25) . . . . "

(5) If not, may said property be used as evidence in a state trial for the offense charged in the indictment?

(6) Does the State of Maine have jurisdiction to prosecute an alleged crime (Possession of LSD–25) which took place wholly within the Federal enclave at the Calais Border Station?"

A preliminary issue incident to the above questions was raised by the Defendant's motion to dismiss the indictment. This issue is that of possible pre-emption of the drug field by federal legislation, which would deny Maine the jurisdiction to prosecute for the offense charged under 22 M. R.S.A. § 2212–B. The Justice below denied the motion, relying on 21 U.S.C.A. § 903, enacted as part of the Comprehensive Drug Abuse Prevention and Control Act of 1970, which states:

"No provision of this subchapter shall be construed as indicating an intent on the part of the Congress to occupy the field in which that provision operates, including criminal penalties, to the exclusion of any State law on the same subject matter which would otherwise be within the authority of the State, unless there is a positive conflict between that provision of this subchapter and that State law so that the two cannot consistently stand together."

The asserted conflict between state and federal statutes arises from the aforementioned 22 M.R.S.A. § 2212–B and 21 U.S. C.A. § 337, part of the scheme of federal drug legislation, which reads in part:

"All such proceedings for the enforcement, or to restrain violations, of this chapter shall be by and in the name of the United States."

■ Of course, due to the supremacy clause[3] of the United States Constitution and our system of federalism, a state statute which conflicts in a certain field with an act of Congress must yield to the federal act. *E. g.,* Gibbons v. Ogden, 22 U.S. (9 Wheat.) 1, 6 L.Ed. 23 (1824). However, the exercise by Congress of its granted powers does not necessarily pre-empt a similar state exercise of power in the same sphere. The United States Supreme Court has held that in deciding if there is conflict, a court must first construe the statutes and then decide if the state enactment is an obstacle to the fulfillment of the objectives expressed by Congress. *See* Perez v. Campbell, 402 U.S. 637, 91 S.Ct. 1704, 19 L.Ed.2d 233 (1971); Hines v. Davidowitz, 312 U.S. 52, 61 S.Ct. 399, 85 L.Ed. 581 (1941).

22 M.R.S.A. § 2212–B is undeniably intended solely to punish criminally those persons in possession of certain hallucinogenic drugs within the State. The state has obviously decided that those who possess certain drugs deemed to be dangerous may use and/or sell them to the detriment of themselves, the state and its citizens.

■ 21 U.S.C.A. § 337 refers to other sections of the statutory chapter which encompasses the Federal Food, Drug, and Cosmetic Act of 1938. This act protects unwary consumers from misbranded and adulterated products and misleading claims through Congress' power to regulate interstate commerce. *See, e. g.,* 62 Cases, More or Less, Each Containing Six Jars of Jam v. United States, 340 U.S. 593, 71 S.Ct. 515, 95 L.Ed. 566 (1951); United States v. Dotterweich, 320 U.S. 277, 64 S.Ct. 134, 88 L.Ed. 48 (1943). 21 U.S.C.A. § 337 applies solely to violations under this act, chapter nine of 21 U.S.C.A. This section in no way affects statutes concerning drug abuse which are elsewhere in the federal code, including that which makes possession of LSD a federal crime under 21 U.S.C.A. § 844.[4]

---

3. U.S.Const. art. 6.

4. There is arguably also a violation of 21 U.S.C.A. § 952, illegal importation of certain controlled substances, including LSD.

Furthermore, the federal code contains the aforementioned 21 U.S.C.A. § 903, an express reservation of state control over relevant aspects of the drug abuse field unless there is a positive conflict between state and federal statutes. Here there is no such conflict which makes concurrent viability of both statutes impossible. Congress evidently intended that both federal and state governments should regulate the drug traffic which has become so prevalent. For the above reasons, the Defendant's claim of pre-emption must fail and his motion was correctly denied.

Next, we must determine if the State of Maine has jurisdiction to arrest and prosecute alleged violators of state statutes on the federal enclave at Calais. In other words, has exclusive jurisdiction over the Customs border crossing area been vested in the United States, nullifying any state authority to enforce its criminal statutes on that enclave? This issue is properly raised by the Justice's denial of the Defendant's supplemental motion to dismiss the indictment.

An examination of the title of the land in question takes one back about forty years. The land, containing 17,687 square feet, was the subject of a petition for condemnation brought by the United States attorney in June, 1934. In December of that year, the federal district court ordered that the land be condemned and title vested in the United States. A jury empaneled in June, 1935 valued the property taken, and the court decreed this damage award in July, 1935. The federal government paid the owners of the land in full, and a final confirmation of these proceedings by the court occurred in January, 1936.[5] Thus, title to the land has existed in the federal government since December, 1934.

Though the land in question is located within the boundaries of the State of Maine and the City of Calais,[6] it may nevertheless be subject to the exclusive jurisdiction of the federal government. This jurisdiction is most commonly derived from art. 1, § 8, cl. 17 (hereinafter clause 17) of the United States Constitution, which decrees that the Congress shall have power to

"exercise exclusive Legislation [7] in all Cases whatsoever, over such District (not exceeding ten Miles square) as may, by Cession of particular States, and the Acceptance of Congress, become the Seat of the Government of the United States, and to exercise like Authority over all places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings . . . ."

(Footnote added.)

■ The instant case concerns the jurisdictional status of land used as a Customs station at the border between Maine and New Brunswick. We have no doubts that a Customs station is included as a needful public building under clause 17 and may become subject to exclusive federal jurisdiction. *See* Kohl v. United States, 91 U. S. 367, 23 L.Ed. 449 (1875); State v. De-Berry, 224 N.C. 834, 32 S.E.2d 617 (1945). Certainly, the need for Customs stations is no less evident than the necessity for forts, magazines, arsenals, and dockyards in the efficient running of our modern federal government.

Furthermore, the obtaining of exclusive jurisdiction by the United States under

---

5. The confirmatory decree which relates these steps in the federal government's acquisition of the land is filed in the Washington County Registry of Deeds, vol. 404, pp. 442–445.

6. *See* State v. Kelly, 76 Me. 331, 334 (1884).

7. Exclusive legislation has been construed as being consistent with exclusive jurisdiction by the United States Supreme Court in Surplus Trading Co. v. Cook, 281 U.S. 647, 50 S.Ct. 455, 74 L.Ed. 1091 (1930).

clause 17 in this case requires that the Congress purchase the needful land with the consent of the State of Maine. Here the land now forming a customs station was obtained by the process of condemnation outlined earlier. Doubts arise as to whether this mode of acquisition is included within the word "purchase", which is the exact language of clause 17.

The earliest landmark Supreme Court case construing the language of clause 17 is Fort Leavenworth R. R. v. Lowe, 114 U.S. 525, 5 S.Ct. 995, 29 L.Ed. 264 (1885). Though the case concerned cession of land by a state to the United States, the opinion discussed what was meant by "purchase" in clause 17. The Court stated that direct purchase was not the only method for acquiring land, for the federal government could also use condemnation or become the beneficiary of ceded land. However, the Court suggested that the exclusive jurisdiction of clause 17 could result only when actual purchase was the method used to acquire property. The Court stated that

> "we are of opinion that the right of exclusive legislation within the territorial limits of any state, can be acquired by the United States only in the mode pointed out in the Constitution,—by *purchase, by consent of the legislature of the state in which the same shall be,* for the *erection of forts, magazines, arsenals, dock-yards, and other needful buildings.* The essence of that provision is that the state shall freely cede the particular place to the United States for one of the specific and enumerated objects." 114 U.S. at 538, 5 S.Ct. at 1002, 29 L.Ed. at 269.

Thus, at that point in time, the Court had apparently distinguished among various methods of acquiring land and decided that only purchase, as opposed to condemnation, was acceptable under clause 17.[8]

However, this narrow reading of the constitutional language was superceded more recently in Paul v. United States, 371 U.S. 245, 83 S.Ct. 426, 9 L.Ed.2d 292 (1963) and Humble Pipe Line Co. v. Waggonner, 376 U.S. 369, 84 S.Ct. 857, 11 L. Ed.2d 782 (1964). In both these cases the question of what is a purchase under clause 17 arose.

■ In *Paul,* the Court noted that clause 17's exclusive jurisdiction could be obtained with the consent of the state legislature by purchase or condemnation, equating the consent and purchase or condemnation to a cession by the state of all jurisdiction except that clearly reserved. In *Waggonner,* the Court more explicitly noted that this "common sense" approach would allow the acquisition of exclusive jurisdiction by cession and consent "just as if the United States had acquired its title by negotiation and payment of a money consideration." 376 U.S. at 372, 84 S.Ct. at 859, 11 L.Ed.2d at 785. Therefore, the narrow reading of purchase found in the Court's earlier opinion in Fort Leavenworth R.R. v. Lowe, supra, is no longer controlling. So long as the state freely cedes land to the United States, we need not be concerned with the technical niceties[9] of purchase versus condemnation in determining both sovereigns' jurisdiction.

■ At the time of the federal government's acquisition of the Calais enclave, two Maine statutes, R.S.1930, ch. 2, §§ 10, 11, were concerned with this act of free cession. Section ten read, in part:

> "In accordance with the constitution of the United States, article one, section eight, clause seventeen, and acts of congress in such cases provided, the consent of the legislature is hereby given to the acquisition by the United States, or under its authority, by purchase, condemnation, or otherwise, of any land in this

---

8. *See* Kohl v. United States, supra, 91 U.S. at 379 (Field, J., dissenting).

9. *Id.*

state, required for the erection of light-houses or for sites for custom-houses, courthouses, post-offices, arsenals, or other public buildings, or for any other purposes of the government . . . ."

The relevant portion of section eleven stated:

"Exclusive jurisdiction in and over any land so acquired by the United States shall be, and the same is hereby ceded to the United States for all purposes except the service upon such sites of all civil and criminal processes of the courts of this state; . . . such jurisdiction is granted upon the express condition that the state of Maine retains a concurrent jurisdiction with the United States in and over the said lands, so far as that civil process, in all cases not affecting the real or personal property of the United States, and such criminal or other process as shall issue under the authority of the state of Maine against any person or persons charged with crimes or misdemeanors committed within or without the limits of the said lands, may be executed therein, in the same way and manner as if no jurisdiction had been ceded."

Section ten explicitly consents to the federal government's taking of land by condemnation for sites for Customs houses "or other public buildings". Section eleven actually cedes land acquired by the federal government subject to the state's reserved concurrent jurisdiction. These statutes manifest the free will of the state through its legislature to cede the land in question to the federal government. The effect of these actions is to vest jurisdiction, possibly exclusive in character, in the United States subject to the state's concurrent jurisdiction, the scope of which will be discussed later.

■ Before examining the extent of the jurisdiction reserved by the state, we must ascertain whether the jurisdiction ceded to the United States in this case has in fact been accepted by the federal government. 40 U.S.C.A. § 255, passed in 1940, requires that the federal government accept such jurisdiction "by filing a notice of such acceptance with the Governor of such State or in such other manner as may be prescribed by the laws of the State. . . ." Unless this procedure is followed, a conclusive presumption arises that there has been no acceptance. However, this act has been held not to apply to lands acquired by the United States prior to 1940. United States v. Johnson, 426 F.2d 1112 (7th Cir.), cert. denied, 400 U.S. 842, 91 S.Ct. 86, 27 L.Ed. 2d 78 (1970); Markham v. United States, 215 F.2d 56 (4th Cir. 1954), cert. denied, 348 U.S. 939, 75 S.Ct. 360, 99 L.Ed.2d 735 (1955).

According to Fort Leavenworth R.R. v. Lowe, supra, a presumption of acceptance of jurisdiction arose when the new jurisdiction conferred a benefit on the federal government. Thus, prior to 1940, no evidence of acceptance was required of the United States. In the present case, there can be no doubt that the acceptance of jurisdiction over the Customs area at Calais resulted in benefits to the operation of the federal government. As the cession of jurisdiction of whatever character here occurred before 1940, it is still conclusively presumed to have been accepted by the federal government.

Having concluded that (1) this is an instance in which exclusive jurisdiction may vest in the United States and that (2) jurisdiction, whatever its dimensions, was accepted by the United States, we must now determine the character of the jurisdiction reserved by the state over the ceded area at Calais.

■ While by its terms, an exclusive jurisdiction vested in the federal government would seem to preclude any assertion of concurrent state jurisdiction in the same land, case history has demonstrated that

this is not necessarily true.[10] It has been held that a state may impose conditions on a cession of or consent to jurisdiction as long as the conditions do not interfere with the federal government's enjoyment of the property. *E. g.,* James v. Dravo Contracting Co., 302 U.S. 134, 58 S.Ct. 208, 82 L. Ed. 155 (1937); United States v. Unzeuta, 281 U.S. 138, 50 S.Ct. 284, 74 L.Ed. 761 (1930); Fort Leavenworth R.R. v. Lowe, supra.

■ State consent and cession statutes commonly reserve concurrent jurisdiction to execute civil and criminal process in the ceded area. This reservation has been deemed to be a condition to the grant and not inconsistent with the federal government's acquisition of exclusive jurisdiction. Lasher v. State, 30 Tex.Crim. 387, 17 S.W. 1064 (Ct.App.1891). Such a reservation has generally been explained as necessary to deny fugitives sanctuary in federal enclaves beyond the reach of state law enforcement powers. *E. g.,* Fort Leavenworth R.R. v. Lowe, supra; Application of Thompson, 157 F.Supp. 93 (E.D.Pa.1957), aff'd, 258 F.2d 320 (1958), cert. denied, 358 U.S. 931, 79 S.Ct. 317, 3 L.Ed.2d 303 (1959); Berube v. White Plains Iron Works, Inc., 211 F.Supp. 457 (D.Me.1962); Commonwealth v. Clary, 8 Mass. (8 Tyng) 72 (1811).

■ The Maine statute which ceded certain jurisdiction to the federal government sought to retain powers beyond that of serving process in the ceded area for crimes committed outside that land. By its terms, R.S.1930, ch. 2, § 11 reserved concurrent jurisdiction

"so far as that civil process . . . and such criminal or other process as shall issue under the authority of the state of Maine against any person or persons charged with crimes or misdemeanors committed *within or without* the limits of the said lands, may be executed therein, in the same way and manner as if no jurisdiction had been ceded." (Emphasis added.)

The statute on its face seeks to retain state authority to execute criminal process against a person charged with crimes committed *inside* the ceded area. A look at the statute's history will clarify the intentions of the state's lawmakers who enacted the statute. *See* Hayes v. State, Me., 247 A.2d 101 (1968); Hanbro, Inc. v. Johnson, 158 Me. 180, 181 A.2d 249 (1962). In determining intent, we also look to the policy behind such a statute. Prudential Ins. Co. of America v. Insurance Comm'r, Me., 293 A.2d 529 (1972).

■ The state has long recognized by statute that process may be executed in places ceded to the United States where concurrent jurisdiction is reserved. *See, e. g.,* R.S.1857, ch. 2, § 2. Likewise, dating from the special laws of 1871, ch. 648, § 1, Maine has given its consent to federal acquisition of property for the public purposes enumerated in clause 17. Since 1903 the revised statutes have followed this section giving consent with a section ceding jurisdiction,[11] and it is this latter section which is our present concern.

P.L.1903, ch. 183, § 1, later R.S.1903, ch. 2, § 10, ceded "jurisdiction" to the United States subject to the state's concurrent jurisdiction to execute process for crimes occurring "within or without" the ceded area.[12] Two years later, P.L.1905, ch. 50,

---

10. In a case upholding the qualifying of cessions, this time by means of a state safety regulation, the United States Supreme Court noted that "[t]he Constitution does not command that every vestige of the laws of the former sovereignty must vanish." James Stewart & Co. v. Sadrakula, 309 U.S. 94, 99, 60 S.Ct. 431, 433, 84 L.Ed.2d 596, 600 (1940).

11. Cession for public purposes under clause 17 was first mentioned by the legislature in P.L.1831, ch. 251, § 1.

12. The statute also placed other conditions on the cession of jurisdiction to the federal government. The statute required that such jurisdiction begin only when title passed to the United States, that evidence of title be

§ 2 ceded *"exclusive* jurisdiction . . . for all purposes except the service upon such sites of all civil and criminal process of the courts of this state. . . . " The latter phrase was incorporated into R.S. 1930, ch. 2, § 11, the law in effect at the time of the cession with which we are concerned, but only in conjunction with the earlier mentioned "within or without" language dating from 1903. We believe that the "within or without" phraseology must be construed in conjunction with the reservation of service of process language of 1905.

The above legislative actions make apparent a legislative intent to cede particular lands for public purposes to the federal government subject to certain limitations. The state surely desired to reserve the power to execute civil and criminal process on the ceded land, probably to prevent the enclaves from being a haven for fugitives. In addition, the statutory language clearly states that criminal process shall be executed for all crimes committed inside, as well as outside, the ceded area. Therefore, we believe that the legislature must also have intended that state criminal law, including powers of arrest and prosecution, should continue to be effective within the ceded area. In no other way can the significance of the "within or without" phrase be explained. Such language would not have been necessary were the state merely seeking to prevent fugitives from hiding inside an enclave. Though the reservation is contradictory to the previously stated granting of exclusive jurisdiction, we find that the state's retained concurrent jurisdiction in R.S.1930, ch. 2, § 11 allows the state to administer its criminal laws and processes fully within areas ceded to the United States under that statute.

We find authority for this position in both federal and state case law, bearing in mind that conditions not inconsistent with the federal government's use of property may be permissibly attached to state consent and cession statutes. In Bowen v. Johnston, 306 U.S. 19, 59 S.Ct. 442, 83 L. Ed. 455 (1939), a federal conviction for a murder which took place on lands ceded for a national park was attacked through habeas corpus. Though this was not a clause 17 case, the applicable principle as to exclusive jurisdiction arising from state cession is the same. A state statute reserved "civil and criminal jurisdiction over persons and citizens in said ceded territory as over other persons and citizens in the State. . . . " Though another statute negated this reservation,[13] the Court stated that if this language alone were at issue, "there would be no room for doubt that jurisdiction to punish for crimes committed on the lands within the Park remained with the State." 306 U.S. at 29, 59 S.Ct. at 447, 83 L.Ed. at 462. Therefore, we believe that it is proper for Maine to qualify its cession by reserving concurrent criminal jurisdiction over ceded land. We see no interference with the operation of the Customs station caused by the state's retained jurisdiction;[14] in fact, the benefits to the Customs officials in terms of efficient and speedy law enforcement by state officers seem obvious.

An analogous case in Montana further supports our position. A federal missile site acquired under clause 17 by consent and cession was the scene of a grand larceny for which the defendant was convicted. The Montana cession statute reserved the

"right to serve and execute civil or criminal process . . . within the limits

---

recorded, and that the jurisdiction last only as long as the United States used the land for the enumerated purpose.

13. This reservation was not effective in *Bowen* due to a later controlling statute which did not reserve this jurisdiction to the state.

14. We do not claim that a state's reserved jurisdiction might never interfere with federal operations, as in the case of a fort operated under complex policies dealing with national security.

of the territory over which jurisdiction is ceded . . . for or on account of . . . crimes committed in this state, within or without such territory. . . ."

The Montana Supreme Court noted that "where the legislature uses the language 'within or without', the only conclusion can be that the intent was . . . to reserve criminal jurisdiction to the state." State v. Rindal, 146 Mont. 64, 70, 404 P.2d 327, 330 (1965). In addition, the Court expressed a clear opinion as to the scope of the state's reservation:

"The fact that section 83–108 expresses a reservation only to serve and execute process cannot be taken as excluding the right to prosecute. Obviously, a state would not reserve the right to serve process for a crime committed in a certain area without retaining jurisdiction to try that crime." 146 Mont. at 70, 404 P.2d at 330.

Therefore, based on our reading of the Maine statute and our analysis of relevant authorities, we believe that the state could and did reserve concurrent jurisdiction over the ceded land to arrest and prosecute for crimes under state law committed there.

At this point, we consider it appropriate to mention briefly the two Maine cases which have dealt with the general situation before us. Brooks Hardware Co. v. Greer, 111 Me. 78, 87 A. 889 (1913) dealt with the jurisdictional status of land ceded to the United States for a veterans' home. This Court held that the corporate establishment which ran the home was under the exclusive jurisdiction of the federal government. In that case, however, the reserved jurisdiction of the state extended only to "crimes committed outside of said lands", and the case itself was not concerned with criminal jurisdiction. Brooks is thus distinguishable from our present case.

The second case is State v. Kelly, 76 Me. 331 (1884) in which a convicted murderer successfully attacked the state's asserted jurisdiction over crimes committed inside Fort Popham, a federal fort purchased by consent of the state. The Court stated:

"[T]he power of congress to legislate for the territory on which a United States fort is erected, is declared by the federal constitution to be exclusive. Consequently, there can be no concurrent jurisdiction. And any statute of the state, which should attempt to exercise such a jurisdiction, must necessarily be unconstitutional and void." 76 Me. at 334–335.

However, this decision was rendered prior to the guiding opinions in Fort Leavenworth R.R. v. Lowe, supra, and other later United States Supreme Court cases which have unambiguously held that a state may reserve concurrent jurisdiction. To the extent that Kelly conflicts with the more flexible reasoning of later courts on the jurisdictional issue, it is overruled. Moreover, it is conceivable that a state's reservation of concurrent criminal jurisdiction could interfere with the functioning of federal military operations. We believe the situation presented us involving a Customs station is distinguishable from the circumstances in Kelly.

At this stage of the opinion, we have concluded that the state reserved concurrent jurisdiction to execute civil and criminal process and to arrest and prosecute for crimes committed on the ceded land. However, in 1939 the legislature repealed the portion of R.S.1930, ch. 2, § 11 which dealt with the reservations above. The "within or without" language mentioned earlier was replaced, the state now retaining only concurrent jurisdiction

"on and over such lands as have been or may hereafter be acquired by the United States so far as that all civil and criminal process which may lawfully issue under the authority of the state of Maine may be executed thereon in the same manner and way as if said jurisdiction had not been ceded. . . ." P.L. 1939, ch. 248.

By its terms, this statute seeks to retain concurrent jurisdiction to serve process on ceded land, previously or later acquired. Statutory language which we held to authorize the state's prosecution of crimes on the ceded land has been deleted. The effect of this statute, if permitted, is to give the federal government greater jurisdiction over the ceded area than it received at the time of cession under R.S.1930, ch. 2, § 11.

■ A re-cession of jurisdiction to the federal government is possible only if the United States accepts such jurisdiction. *See* Silas Mason Co. v. Tax Comm'n, 302 U.S. 186, 58 S.Ct. 233, 82 L.Ed. 187 (1937). Of course, prior to 1940, we know that acceptance of jurisdiction over ceded land was presumed. *See* Fort Leavenworth R.R. v. Lowe, supra; United States v. Johnson, supra; Markham v. United States, supra. However, this presumption follows only in instances where the federal government has received a *benefit* from the grant of jurisdiction.

■ In the case at hand, there is no evidence that the federal government's operation of the Customs station at Calais is benefitted by acquiring *sole* jurisdiction to prosecute crimes committed on that ceded land and we can infer none from the facts. It is surely more convenient for the local and state police to handle local criminal matters in this small border enclave than it would be for the federal government to send agents to the area. If the federal government wishes to prosecute a certain crime, it may do so under its concurrent jurisdiction as existing prior to this 1939 state law. It is clear that the federal government was content with the jurisdiction it had retained at the time of cession, and greater jurisdiction might only lead to practical problems for the federal authorities. It is quite evident that federal officials charged with the enforcement of federal laws have made no claim of exclusive jurisdiction in this enclave but have encouraged the exercise of jurisdiction by the state.[15] Without indication of benefits conferred on the federal government by this additional jurisdiction, we feel that exclusive jurisdiction to prosecute crimes committed on ceded land cannot be forced on the United States. *See* Silas Mason Co. v. Tax Comm'n, supra. The lack of a benefit conferred precludes our application of the presumption of acceptance for lands acquired prior to 1940. As no acceptance is on the record, the jurisdiction of the federal government with respect to the prosecution of crimes committed on the federal enclave at Calais remains concurrent with that of the state under the terms of R.S. 1930, ch. 2, § 11.[16]

■ The final question presented by the Defendant is raised by the Justice's denial of a motion to suppress evidence. The Defendant asserts that the Customs officials had no right to turn over evidence they had seized inside the enclave to state officials for use in a prosecution by the state. Relying mainly on 19 U.S.C.A. § 1581(e),[17] the Defendant alleges that the

---

15. Under the general principle of contemporaneous construction, we examine a statute and its meaning aided by the history of the statute's application to particular instances. *See* In re O'Donnell's Express, Me., 260 A.2d 539, 544 (1970); Mottram v. State, Me., 232 A.2d 809, 816 (1967). The record here reveals that the vast majority of drug cases from the Calais enclave have been turned over to the local police for prosecution. An experienced Customs agent testified that of the fifty to seventy-five drug arrests he has handled in the past two years, only one or two were given to federal authorities for prosecution.

16. We do not deem it necessary to examine the possible effect of 8 U.S.C.A. § 1358, as we find concurrent jurisdiction already reserved by the State of Maine. Section 1358 is an immigration statute passed in 1952 which might be construed to return concurrent jurisdiction over immigration stations to the state in which the station is located.

17. "If upon the examination of any vessel or vehicle it shall appear that a breach of the laws of the United States is being or has been committed so as to render such vessel or vehicle, or the merchandise, or any part thereof . . . liable to forfeiture

Customs official is under a statutory duty to seize evidence of a breach of federal law and is given no authority to part with such evidence. Furthermore, the Defendant claims that this cooperation between federal and state officials allows state officials to procure prosecutional evidence which they could not seize themselves under standards of probable cause under the United States and Maine Constitutions.

We disagree with both the statutory and constitutional theories proposed by the Defendant. The former claim results from reading language which does not exist into the statute. The statute requires that certain evidence be seized by Customs officials when it appears there is a breach of federal law. Additionally, 19 U.S.C.A. § 1602 states that the Customs officer shall report seizures and turn over seized evidence to the appropriate Customs official for his district. 19 U.S.C.A. § 1603 further requires this "appropriate customs officer" to notify the United States attorney of the circumstances of the violation of the law where "legal proceedings by the United States attorney . . . are required." Nowhere in this statutory scheme is there language which requires that such cases be prosecuted by the United States. Moreover, 19 U.S.C.A. § 1604 lends some leeway to the United States attorney in deciding whether to prosecute cases reported to him by Customs officials. Neither is there a prohibition which forbids the federal Customs officials from making seized evidence available to state officials for state prosecutors.

The record discloses that the Customs official who discovered the possible violation of federal law immediately called his superior, who directed the official to call the local police. This superior qualifies as an "appropriate customs officer" under the statute. This officer knew of the long-standing practice whereby the United States attorney turned over such minor

drug cases to local police. Because of this practice and the concurrent jurisdiction of the state over such crimes, legal proceedings by the United States attorney were not required under 19 U.S.C.A. § 1603. Even if the federal officials were remiss in their duties in not prosecuting the Defendant under federal law—and we do not suggest that such is the case—this would not bar the use of the properly seized evidence by state officers. Statutorily, we perceive no bar to the actions of the Customs officials as presented in this case.

■ Similarly, we see no constitutional violation occasioned by this turning over of evidence to the local police. The seizure by the Customs officials was reasonable and proper as based on mere suspicion at a border crossing. *See, e. g.,* Alexander v. United States, 362 F.2d 379 (9th Cir.), cert. denied, 385 U.S. 977, 87 S.Ct. 519, 17 L.Ed.2d 439 (1966). There was no seizure by the Calais policeman who received the evidence from the Customs officer. We do not perceive any policy similar to that directed toward police officers in Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed. 2d 1081 (1961) which would lead us to forbid this cooperation between federal and state officials. The turning over of evidence does not promote improper conduct by either local police or Customs agents.

We recently stated our support of such cooperative activity in State v. Gallant, Me., 308 A.2d 274, 277 (1973) :

"As there is no bar to officers of one jurisdiction accepting and using evidence legally seized by officers of another jurisdiction, the sole issue in this case is the legality of the actions of the federal officers."

*See* People v. Mitchell, 275 Cal.App.2d 351, 79 Cal.Rptr. 764 (1969), cert. denied, 397 U.S. 1053, 90 S.Ct. 1394, 25 L.Ed.2d 669 (1970). Therefore, the Justice's denial of

---

or to secure any fine or penalty, the same shall be seized and any person who has engaged in such breach shall be arrested." Also possibly involved is 19 U.S.C.A. § 482,

which allows searches and seizures to recover merchandise unlawfully introduced into the country in the context of duty imposition.

the motion to suppress was proper, and the evidence given to the Calais police by the Customs agent may properly be used in a state criminal proceeding.

In sum, we uphold the Justice's rulings on the motion to dismiss the indictment, the supplemental motion to dismiss the indictment, and the motion to suppress evidence. Answers to the questions propounded to us on report follow.

(1) Is the border station enclave manned by United States Customs agents at Calais under the exclusive jurisdiction of the United States Government? No. The state has reserved concurrent jurisdiction with the federal government to serve civil and criminal process and prosecute violations of state criminal statutes committed on the Calais enclave.

(2) Did the Calais Police have authority to arrest Defendant on said enclave?

Yes. The concurrent jurisdiction reserved by the state to prosecute crimes occurring on the enclave carries with it the power to arrest for such crimes within the enclave.

(3) If not, does this preclude prosecution by the State of Maine for the offense for which Defendant was arrested?

Due to our answer to (2), this question is inapplicable.

(4) Did the United States Customs officials have the right to turn over to the Calais Police property which they had seized from Defendant within the enclave for a Customs violation for use as evidence in the instant criminal prosecution by the State of Maine?

Yes. No constitutional, statutory or policy considerations prohibit cooperation of this type between federal and state authorities.

(5) If not, may said property be used as evidence in a prosecution by the State of Maine for the offense charged in the indictment?

Due to our answer to (4), this question is inapplicable.

(6) Does the State of Maine have jurisdiction to prosecute an alleged crime (Possession of LSD–25) which took place wholly within the federal enclave at the Calais Border Station?

Yes. The state has reserved concurrent jurisdiction which allows it to prosecute for crimes occurring on the federal enclave at Calais.

The entry will be:

Case remanded to Superior Court for trial.

All Justices concurring.