No. 20,248.

THE PEOPLE OF THE STATE OF COLORADO *v.*
GLEN P. SULLIVAN, ET AL.
(378 P. [2d]  633)

Decided February 11, 1963.

Mr. DUKE W. DUNBAR, Attorney General, Mr. FRANK E. HICKEY, Deputy, Mr. DON W. HIGBY, District Attorney, Mr. HERMAN A. RATNER, Deputy District Attorney, for plaintiff in error.

Messrs. STRAND & GEDDES, Messrs. TARTER & TARTER, for defendants in error.

*En Banc.*

MR. JUSTICE McWILLIAMS delivered the opinion of the Court.

THE issue to be resolved is whether the State of Colorado has jurisdiction in and over the property commonly known as NORAD (North American Air Defense Command), situate in El Paso County near the City of Colorado Springs, to the end that a theft allegedly committed thereon may be prosecuted in the state courts as a violation of its criminal laws.

Sullivan and Lane were jointly charged in the district court of El Paso County with the theft on July 18, 1961, of one "air trigger" Gardner power hoist with a value of $800 of the personal property of the Utah Construction Company, "at said County of El Paso." At the conclusion of the People's case Sullivan and Lane moved

to dismiss the larceny charge on the general ground that the evidence was insufficient to support the accusation. This motion was denied. Whereupon the defendants then moved to dismiss for the separate and additional ground that there was a "lack of jurisdiction." This motion was argued, but the court reserved ruling on the matter.

The only evidence offered by the defendants was a copy of a Decree of Condemnation or Declaration of Taking, entered by the United States District Court for the District of Colorado on November 20, 1959, whereby title to the NORAD construction site vested in the United States of America as of that date.

Thereafter, apparently as a rebuttal witness, the People called the "chief" of the real estate division of the Air Defense Command who testified, in effect, that he personally never did "indicate acceptance," on behalf of the United States, of criminal jurisdiction over NORAD and from his own knowledge there had been no such acceptance thereof.

The trial court thereupon denied the defendants' motion to dismiss for "lack of jurisdiction" and submitted the case to the jury, which adjudged both defendants guilty of theft of the hoist and placed a value thereon of $800.

Subsequently the defendants filed "Combined Motions of Defendants for Renewal of Motion for Judgment of Acquittal and Motion for New Trial." These "combined motions" were never ruled upon by the trial court for reasons which are set forth, infra.

The defendants also filed a "Renewal of Motion for Arrest of Judgment," generally averring "that the court was without jurisdiction of the offense charged, since the offense, if an offense was committed, was committed on United States Government property acquired by condemnation and the State Courts of Colorado surrendered jurisdiction by the Statutes made and provided." The trial court granted the motion for arrest of judgment

and held "that this court is . . . without jurisdiction over the offense charged . . . and that all proceedings, arrest and process are declared null and void" for the announced reason that the "crime occurred, if any crime was committed at all," on NORAD over which the State of Colorado and its courts have no jurisdiction. By writ of error the People seek reversal of this order and judgment.

Disposition of the controversy involves a consideration of certain state and federal statutes relating to the transfer of jurisdiction from the State of Colorado to the United States when the latter acquires land, be it by purchase or condemnation, in Colorado.

In 1907 the General Assembly enacted the following statute, which now appears, in part, as C.R.S. '53, 142-1-3 and 4 and reads as follows:

"142-1-3 . . . Exclusive jurisdiction in and over any land so acquired by the United States shall be and the same is hereby ceded to the United States for all purposes, except the service of all civil and criminal process of the courts of this state; but the jurisdiction so ceded shall continue no longer than the said United States shall own such land.

. . .

"142-1-4 . . . The jurisdiction ceded shall not vest until the United States shall have acquired the title to the said lands by purchase, condemnation or otherwise; and so long as the said lands shall remain the property of the said United States when acquired and no longer, the same shall be and continue exempt and exonerated from all state, county and municipal taxation, assessment or other charges which may be levied or imposed under the authority of this state."

On October 9, 1940, the Congress of the United States enacted the following statute, which now appears as 50 U.S.C. §175 (the same statute also appears as 40 U.S.C. §255), and reads as follows:

"Notwithstanding any other provision of law, the ob-. taining of exclusive jurisdiction in the United States over lands or interests therein which have been or shall hereafter be acquired by it shall not be required; but the head or other authorized officer of any department or independent establishment or agency of the Government may, in such cases and at such times as he may deem desirable, accept or secure from the State in which any lands or interests therein under his immediate jurisdiction, custody, or control are situated, consent to or cession of such jurisdiction, exclusive or partial, not theretofore obtained, over any such lands or interests as he may deem desirable and indicate acceptance of such jurisdiction on behalf of the United States by filing a notice of such acceptance with the Governor of such State or in such other manner as may be prescribed by the laws of the State where such lands are situated. Unless and until the United States has accepted jurisdiction over lands hereafter to be acquired as aforesaid, it shall be conclusively presumed that no such jurisdiction has been accepted. . . ."

Before proceeding to analyze the foregoing statutes, it is deemed helpful to consider certain fundamental principles involved in the transfer of sovereignty from a State to the United States where the latter acquires real property within the geographical confines of the former.

In 22 C.J.S. criminal law §139, p. 373, appears the following:

" . . . Generally in order to deprive the state courts of criminal jurisdiction over lands ceded to the United States there must be a surrender of jurisdiction by the state and an acceptance of jurisdiction by the United States. Moreover, where the federal government has not given notice of acceptance of jurisdiction over land acquired by it in a state, the federal courts are without jurisdiction of prosecution for an alleged crime commit-

ted therein although a state statute authorizes the United States to take jurisdiction, or at least the United States is without exclusive jurisdiction over the offense, and a state may enforce its criminal laws within the area acquired by the United States."

█ In 91 C.J.S. United States §7, p. 22, it is declared:

"The mere fact that the United States needs and acquires property within a state's boundaries does not necessitate the assumption by the government of the burdens incident to an exclusive jurisdiction by acceptance of the state's grant thereof; the grant may be accepted or declined. Certainly there is no constitutional principle which compels acceptance by the United States of an exclusive jurisdiction contrary to its own conception of its interests; and the mere acquisition of property in the state by the United States with the consent of the state or a cession of exclusive jurisdiction by the state does not ipso facto divest the state of sovereignty and vest exclusive jurisdiction in the United States.

"It was formerly held that acceptance of the cession by the United States was evidenced by its purchase of the land or the performance of other acts manifesting its intention to accept the jurisdiction ceded, that acceptance might be presumed, and that land purchased with consent of the state ipso facto fell within the exclusive jurisdiction of the United States. However, in conformity with the rule that the government has power to accept exclusive jurisdiction or less, congress, in order to create a definite method of acceptance of jurisdiction so that all persons could know whether, as to particular property, the government had obtained no jurisdiction at all, or partial jurisdiction, or exclusive jurisdiction, enacted a law providing that United States agencies and authorities may accept exclusive jurisdiction of lands acquired by the United States by filing a notice with

the Governor of the state, and that unless and until that is done, it shall be conclusively presumed that no such jurisdiction has been accepted."

■ The real issue is whether the State of Colorado by appropriate statute may not only cede and consent to the acquisition by the United States of exclusive jurisdiction over land acquired by it in Colorado, but may go further and *compel* the United States to accept such jurisdiction and even prescribe *when* such shall vest in the United States. The answer to this question is that neither Colorado nor any other State has such power.

In support of this conclusion, see in addition to 91 C.J.S. p. 22, *Silas Mason Co. v. Tax Commission* (1937), 302 U.S. 186, where it was declared:

". . . As such a transfer [of exclusive jurisdiction] rests upon a grant by the State, through consent or cession, it follows in accordance with familiar principles applicable to grants, *that the grant may be accepted or declined.* Acceptance may be presumed in the absence of evidence to a contrary intent, *but we know of no constitutional principle which compels acceptance by the United States of an exclusive jurisdiction contrary to its own conception of its interest.* The mere fact that the government needs title to property within the boundaries of a State, which may be acquired irrespective of the consent of the State . . . does not necessitate the assumption by the government of the burdens incident to an exclusive jurisdiction. We have frequently said our system of government is a practical adjustment by which the national authority may be maintained in its full scope without unnecessary loss of local efficiency." (Emphasis supplied.)

*Atkinson v. Oregon* (1938) 303 U.S. 20 quoted with approval the foregoing excerpt from the *Silas Mason* opinion. Both of these cases antedated 1940, hence the language to the effect "that acceptance may be pre-

sumed in the absence of evidence of a contrary intent" is no longer applicable. In 1940 Congress enacted into law that which now appears as 50 U.S.C. §175 and which takes the matter of acceptance out of the area of "presumptions" and spells out the precise manner in which a tender of exclusive jurisdiction by a State may be accepted by the United States.

██ As to the practical effect of 50 U.S.C. §175, see *Adams v. United States* (1943), 319 U.S. 312, where it was held that the United States did not have jurisdiction to prosecute in its courts certain defendants charged with rape, the act occuring in Camp Claiborne, Louisiana. In so holding, the Supreme Court of the United States stated that "the Act [50 U.S.C. §175] created a definite method of aceptance of jurisdiction so that all persons could know whether the government had obtained 'no jurisdiction at all, or partial jurisdiction or exclusive jurisdiction.' " The court went on to declare that notice of acceptance is required, whether the United States is to obtain exclusive or concurrent jurisdiction. There being no evidence of any acceptance by the United States of jurisdiction over Camp Claiborne, it was accordingly held that the United States had no jurisdiction to prosecute a crime allegedly committed thereon.

Viewed in this context, we conclude that C.R.S. '53, 142-1-3 merely provides that exclusive jurisdiction over land acquired by purchase or condemnation by the United States in Colorado is ceded or tendered to the United States, with the proviso as set forth in C.R.S. '53, 142-1-4 that such exclusive jurisdiction shall *not* vest, however, prior to the time when the United States shall acquire title thereto. This latter statute does not declare when, thereafter, exclusive jurisdiction *shall* vest. Indeed, under the authorities set forth, supra, Colorado *could not* compel the United States to accept exclusive jurisdiction over NORAD, for example, and, a fortiori,

442

could not determine *when* such jurisdiction should vest in the United States.

■ In the instant case it is agreed that as of July 18, 1961, the date the theft was allegedly committed, the United States had acquired title to the NORAD property, but in the record before us there is nothing to indicate that the United States as of that date had accepted exclusive jurisdiction thereover in the manner prescribed by 50 U.S.C. §175. In fact, the evidence on this point, such as it is, indicates that there was no acceptance of any such jurisdiction by the United States over NORAD.

Sullivan and Lane contend that the real issue is whether Colorado has *lost* criminal jurisdiction over NORAD, and not whether the United States has *acquired* such jurisdiction. They argue that the fact, if it be a fact, that the United States does not have criminal jurisdiction over NORAD, has absolutely no bearing on the ultimate issue of whether Colorado has by statute lost its jurisdiction over NORAD. It is hopefully suggested that neither the United States nor Colorado has jurisdiction to prosecute one who commits an alleged criminal act on NORAD. The incongruity of this result should not, they say, deter us from so holding. In their opinion, if this be a "gap" which creates a "no-man's land" within our state, the answer thereto is corrective legislation, not judicial construction. In their general analysis of the situation Sullivan and Lane are quite mistaken, as the question of whether the United States has gained exclusive jurisdiction over NORAD is by its very nature inextricably intertwined with the very related issue as to whether Colorado has lost *all* jurisdiction thereover.

■ Colorado being a sovereign state cannot abandon its sovereignty over land situated within its four corners. Under the authorities cited, supra, the fact that the United States acquires land in Colorado, either by purchase or condemnation, does not *ipso facto* divest Colo.

rado of sovereignty and vest exclusive jurisdiction in the United States, and this is true even though the acquisition be with Colorado's statutory consent and cession of exclusive jurisdiction. Colorado very well may, as it has done in the instant case, cede or tender exclusive jurisdiction over, for example, NORAD to the United States, and it may even go further and declare that there shall be no vesting until the United States actually gets title. But it cannot compel the United States to accept exclusive jurisdiction, and until the United States accepts this tender of sovereignty the State of Colorado retains its jurisdiction to the end that it may enforce its criminal laws within the geographical confines of NORAD. In other words, the fact that there is an outstanding tender of jurisdiction does not divest Colorado of jurisdiction, as Colorado retains jurisdiction unless and until this tender is accepted.

For these reasons, we conclude that the order granting the motion for "arrest of judgment" is erroneous and such is therefore reversed and the cause remanded with directions to the trial court to vacate this order and then proceed to a final disposition of the case, whatever it may be.

MR. JUSTICE MOORE not participating.