562 P.2d 1090

**STATE of Arizona, Appellee,**

v.

**Louis J. DYKES Appellant.**

**No. 1 CA–CR 905.**

Court of Appeals of Arizona, Division 1, Department C.

March 1, 1977.

Rehearing Denied March 30, 1977.

Review Denied April 19, 1977.

**594**

Bruce E. Babbitt, Atty. Gen. by William J. Schafer, III, Chief Counsel, Crim. Div., Shirley H. Frondorf, Asst. Atty. Gen., Phoenix, for appellee.

Ross P. Lee, Maricopa County Public Defender by Rudy J. Gerber, Deputy Public Defender, Phoenix, for appellant.

EUBANK, Judge.

This appeal raises primarily the issue of the use of appellant's silence upon being arrested as evidence of his criminal negligence in a subsequent manslaughter trial. It also raises the issue of the federal government's exclusive criminal jurisdiction over the Gila Bend Air Force Gunnery Range.

Appellant and James Dale McDaniel, previously had organized expeditions to the Gila Bend Gunnery Range, a 2.75 million acre military facility lying south and west of Phoenix, Arizona. The desert-area range is used by United States Air Force planes for shelling and strafing practice and is littered with brass shell casings. The purpose of appellant's occasional expeditions onto the range was to steal a truckload of casings which he later would sell for scrap metal.

Appellant would recruit assistants, all young men, from housing projects in Phoenix. He paid his assistants $25 per day, with a promise of a bonus for extra effort. For the expedition in question, appellant recruited twelve persons.

The men arrived at the range on Friday night, May 24, 1974, and set up a base camp. They collected casings during the next day, and, later that day, appellant and McDaniel drove to Gila Bend in order to replenish their water supply. While in Gila Bend, the two men rented a room at a motel where they went swimming.

On their way back to the base camp, appellant and McDaniel found five of their workers at "Nine Mile Well," some twelve miles from their base camp. The five younger men had walked to the well (which contained nonpotable water) because of thirst.

On Sunday, the temperature on the range eventually reached 115°. Early in the morning, the men were collecting casings on a section of the gunnery range known as Range Three. As they were working, an Air Force helicopter flew overhead. The young men scattered and hid while appellant and McDaniel, who were in the pick-up truck carrying the group's water supply, drove away. They testified that they intended to camouflage the truck.

The truck became stuck, and the helicopter returned and landed. McDaniel had hidden, and appellant remained at the

truck. Appellant surrendered peaceably and was taken first to the Air Force base, and then to the Gila Bend Sheriff's substation. McDaniel later returned to the truck, took a container of water and a 30–06 rifle, and began to walk out of the range.

The testimony is conflicting about the knowledge of the Air Force of the presence of other persons on the range. Appellant said nothing about the others until 8:00 p. m., the next day, Monday, after he had learned that the Gila Bend Sheriff's substation had been receiving calls about Angel Contreras, one of the men who had gone with appellant to the range. Appellant then told the deputy on duty that some of his group might still be on the desert. The deputy indicated that the proper procedure was for a missing persons report to be filed. In any event, no search was mounted until several hours later, early on Tuesday morning.

Two young men, Ted Ponse and Joe Mellote, had found their way to a road and were picked up and given water by a Sgt. Zilisch and his wife. Further down the road, Sgt. Zilisch picked up McDaniel. The three men were taken to a service station in Gila Bend and eventually found their way back to Phoenix. None of these men reported that anyone else might remain on the desert.

Another young man, Charles Grignon, walked out of the desert to Gila Bend and got a lift back to Phoenix. Grignon did not tell anyone until Monday night that his companions remained in the desert.

Four young men managed to get to Nine Mile Well, where they were found alive on Tuesday.

Five of the men did not survive the heat, and their bodies were found following the search on Tuesday. They had died of dehydration. Appellant and McDaniel were charged in state court with five counts of involuntary manslaughter, A.R.S. § 13–456, were tried separately, and were convicted as charged.

Appellant raises four issues on appeal. Although we find that one of appellant's arguments requires that the conviction be reversed and the cause remanded for a new trial, we will discuss all the contentions, since it is obvious that they will be raised again during the re-trial of this matter.

The questions presented, as phrased by appellant in his opening brief, are:

I   Did the state court lack jurisdiction?

II  Was the prosecution of this defendant arbitrary, capricious, a denial of equal protection, and an attribution of a criminal mens rea when none in fact existed?

III Did the trial court err in permitting the defendant's Fifth Amendment right to silence to be used against him to establish his guilt?

IV  Did the trial court err in refusing defendant's motion to suppress certain evidence because of a failure to provide defendant the standard *Miranda* warnings?

## I.   JURISDICTION

In his brief appellant argues that, because the crime occurred on federal property, the state was without jurisdiction to try appellant "because exclusive jurisdiction over criminal offenses committed on federal military property rests in the Federal government."

The land on which the crime occurred was purchased by the United States from Mexico in 1853. When Arizona became a state, the United States retained title to the land pursuant to the Enabling Act passed by Congress. *See* 36 U. S. Statutes, 61st Congress, Chapter 310, § 20(1910); 1 A.R.S., Enabling Act, p. 80, 1956. Appellant claims that the federal government acquired exclusive jurisdiction over the land by virtue of the Enabling Act. Section 20 of the Act provides, *inter alia*,

* * *   [T]he people inhabiting said proposed State do agree and declare that they forever disclaim all right and title to the unappropriated and ungranted public lands lying within the boundaries thereof and to all lands lying within said boundaries owned or held by any Indian or Indi-

an tribes, the right or title to which shall have been acquired through or from the United States or any prior sovereignty, and that until the title of such Indian or Indian tribes shall have been extinguished the same shall be and remain subject to the disposition and under the absolute jurisdiction and control of the Congress of the United States[.]

Contrary to appellant's assertion, the Arizona Enabling Act did not vest exclusive jurisdiction over the land in the federal government, but rather reserved a proprietary interest in the property in the federal government. *See Fort Leavenworth R. Co. v. Lowe*, 114 U.S. 525, 5 S.Ct. 995, 29 L.Ed. 264 (1885); *Richardson v. Turner*, 16 Utah 2d 371, 401 P.2d 443 (1965); *State v. Johnson*, 81 S.D. 20, 130 N.W.2d 106 (1964). There is a vast difference between proprietary ownership of the public domain and exclusive jurisdiction. Appellant cites no authority to support his contention. To the contrary the case law and logic dictate the opposite conclusion. *See Fort Leavenworth v. Lowe*, supra. Further, if the statutory language cited by appellant was meant to confer exclusive jurisdiction, then the subsequent section of the Act granting exclusive jurisdiction over the Indian lands would be unnecessary, and the cession statutes (infra) enacted by the states would also be unnecessary as to land in the public domain. Finally, appellant's contention would mean the federal government has exclusive jurisdiction over all of the public domain land in Arizona. This is simply not the law.

Next, appellant contends that Arizona ceded jurisdiction to the federal government by statutory enactment in 1913. The Arizona Code of 1913 provided:

4633. The consent of the State of Arizona is hereby given, in accordance with the seventeenth clause, eighth section of the first article of the Constitution of the United States, to the acquisition by the United States, by purchase, condemnation, or otherwise, of any land in this state required for sites for custom houses, court houses, post offices, arsenals, or other public buildings, or for any other purposes of the government.

4634. Exclusive jurisdiction in and over any land so acquired by the United States shall be, and the same is hereby ceded to the United States for all purposes, except that the right is reserved to the state to serve upon any such sites all civil and criminal processes of the courts of this state; but the jurisdiction so ceded shall continue only so long as the United States shall own such land.

4635. The jurisdiction ceded shall not vest until the United States shall have acquired the title to the said lands by purchase, condemnation or otherwise; and so long as the said lands shall remain the property of the United States when acquired as aforesaid, and no longer, they shall be and continue exempt and exonerated from all state, county and municipal taxation, assessment or other charges which may be levied or imposed under the authority of this state.

4636. Exclusive jurisdiction over the military reservations of Fort Apache in Navajo County, Port Huachuca in Cochise County, Whipple Barracks, and Whipple Barracks Target Range in Yavapai County, and all the lands now or hereafter embraced within such reservations are hereby ceded to the United States for all purposes, except that the right is reserved to the state to serve all civil and criminal processes of the courts of this state within said reservations; but the jurisdiction so ceded shall continue only so long as the United States owns such reservations and the lands embraced therein, and so long as said reservations and lands embraced therein shall remain the property of the United States, and no longer, they shall continue exempt and exonerated from all state, county and municipal taxation, assessment or other charges which may be levied or imposed under the authority of this state. (Rev. Stat. of Ariz., Civil Code 1913, ch. 10).

Article I, Section 8 of the U. S. Constitution, which is referred to in the Act, provides:

The Congress shall have Power . . . To exercise exclusive Legislation in all Cases whatsoever, over such District (not exceeding ten Miles square) as may, by Cession of particular States, and the Acceptance of Congress, become the Seat of the Government of the United States, and to exercise like Authority over all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings;

■ It is well established that before the United States government can acquire exclusive jurisdiction over land located within the boundaries of the state, there must be a joint concurrence of a cession by the state and an acceptance by the United States government. *Silas Mason Co. v. Tax Commission*, 302 U.S. 186, 58 S.Ct. 233, 82 L.Ed. 187 (1937). At the time of this 1913 grant by Arizona, the land in question was not being used for the purposes contemplated by the Constitution or the statute. It is our opinion that the 1913 Arizona cession statute was intended to apply only to lands which the federal government used for some specific purpose and for which the federal government derived some benefit from the exercise of exclusive jurisdiction at that time. *See State v. Allard*, 313 A.2d 439 (Me.1973). Since the Gila Bend land was in the public domain and not being used for the purposes contemplated by the Act and the Constitution, exclusive jurisdiction was not established by the 1913 Act. Further, the Arizona Act provides for exclusive jurisdiction over specified areas used by the federal government. Because the Gila Bend area is not included, the 1913 Act, by itself, does not vest jurisdiction in the federal government.[1]

Due to the confusion and litigation regarding the jurisdiction of lands used for federal purposes, Congress amended two statutes in 1940 specifying the manner in which the federal government could acquire exclusive jurisdiction over land which it acquired. *See* 40 U.S.C. § 255; 50 U.S.C. § 175.

■ In 1941, President Roosevelt by executive order withdrew the land in question from the public domain and established the land as an aerial gunnery and tow target firing range. In 1951, Arizona again enacted a concession statute, ceding jurisdiction "over any public domain in the state reserved or used for military purposes," A.R.S. § 26–252. However, the United States has never taken any action under the 1940 statute or otherwise to indicate acceptance of exclusive jurisdiction from the state. It is well established that a state cannot force the federal government to accept exclusive jurisdiction by a cession statute; rather, there must be an acceptance to jurisdiction by the federal government. *Adams v. United States*, 319 U.S. 312, 63 S.Ct. 1122, 87 L.Ed. 1421 (1943). In spite of the existence of simple procedures for such acceptance under the 1940 statutes, there is no evidence in the record that the federal government has affirmatively accepted exclusive jurisdiction over the land.

■ Appellant argues that the land in · question was acquired by the government prior to 1940 and therefore the provisions of the 1940 Acts are not applicable. Appellant is correct that certain cases have held that the federal government need not follow the provisions of the 1940 statutes for land acquired prior to 1940. *See United States v. Redstone*, 488 F.2d 300 (8th Cir. 1973); *United States v. Johnson*, 426 F.2d 1112 (7th Cir. 1970), cert. denied, 400 U.S. 842, 91 S.Ct. 86, 27 L.Ed.2d 78 (1970); *Markham v. United States*, 215 F.2d 56 (4th Cir. 1954), cert. denied, 348 U.S. 939, 75 S.Ct. 360, 99 L.Ed. 735 (1955); *United States v. Heard*, 270 F.Supp. 198 (W.D.Mo.1967). However, the rule established in each of those cases was that prior to 1940 the federal government would be presumed to accept exclu-

---

1. The state argues that because the relevant section of the 1913 Act was not re-enacted by the Legislature in 1928, that the 1913 Act was repealed. Although appellant does not dispute this contention, we feel the question of jurisdic-tion can be decided on other grounds and do not rule on the 1928 Legislature's intent in failing to readopt this provision. *See Hunter v. Northern Arizona Utilities Co.*, 51 Ariz. 78, 74 P.2d 577 (1937).

sive jurisdiction if it would derive a benefit from such acceptance. *See Fort Leavenworth R. Co. v. Lowe,* supra; *State v. Allard,* supra. In each case the federal government had erected some building on the land prior to 1940 and therefore could be presumed to accept jurisdiction. In this case, prior to 1940, it appears that the United States did not use the land for the purposes set forth in the constitution, exercise any jurisdiction over it or derive any benefit from exclusive jurisdiction over the land. In fact, the record shows that prior to its withdrawal in 1941 the land was in the public domain. In the absence of some evidence of acceptance of jurisdiction prior to 1940, we cannot say that the federal government accepted jurisdiction. We agree with *State v. Johnson,* supra, 130 N.W.2d at p. 109, where the court stated, "A presumption of transfer of jurisdiction when in fact there had been no assumption of jurisdiction by the federal government would cause confusion and make possible a no man's land within the state. Such interpretation of the statutes would be absurd and unreasonable."

Further, in each case cited by appellant, the land was acquired by the federal government for a purpose specifically designated in the state's cession statute. In the current case, prior to 1941, no such purpose for federal acquisition existed. Accordingly, exclusive jurisdiction did not vest in the federal government.

■ Next, appellant stresses that both 40 U.S.C. § 255 and 50 U.S.C.A. § 175 provide that, "Unless and until the United States has accepted jurisdiction over lands *hereafter* to be acquired as aforesaid, it shall be conclusively presumed that no such jurisdiction has been accepted [appellant's emphasis]." Appellant therefore argues that be-

cause the federal government had acquired the land prior to 1940, the 1940 statutes do not apply. We feel appellant's interpretation of the statute is erroneous. The purpose of the statutes was to create a clear and unambiguous method of determining which sovereign had jurisdiction over any particular parcel of land.[2] Where the federal government had already acquired jurisdiction, there would be no need for it to reaffirm its jurisdiction. However, where, as in the current case, the United States did not obtain exclusive jurisdiction prior to 1940, the federal government's acceptance should be pursuant to the terms of the 1940 statute. If this were not the case, the problems which the 1940 statutes intended to solve would still remain for the vast tracts of land which were placed in the public domain at the time of statehood. If the federal government desires exclusive jurisdiction over the land, it is little trouble for it to accept it under the 1940 Acts.

■ Finally, 40 U.S.C. § 255 and 50 U.S.C. § 175 authorize department or agency heads of the federal government to accept exclusive or partial jurisdiction when deemed desirable by filing a notice of such acceptance with the governor of such state or such other state agency as state law prescribes. If acceptance is not made, "it shall be conclusively presumed that no such jurisdiction has been accepted." This presumption places the burden of showing federal agency acceptance on the defendant who contends that the state court is without jurisdiction. *See Dobbins v. State,* 114 Ga.App. 403, 151 S.E.2d 549 (1966). *Cf. U. S. v. Pate,* 393 F.2d 44 (7th Cir. 1968), cert. denied, 393 U.S. 890, 89 S.Ct. 209, 21 L.Ed.2d 168 (1968); *Kansas City v. Garner,* 430 S.W.2d 630 (Mo.App.1968); *State v. Johnson,* 81 S.D. 20, 130 N.W.2d 106 (1964); *People v. Sullivan,* 151 Colo. 434, 378 P.2d

---

2. In *Adams,* supra, the U. S. Supreme Court discussed the purpose and policies of the 1940 Acts:

These cases arose from controversies concerning the relation of federal and state powers over government property and had pointed the way to practical adjustments. The bill [the 1940 statute] resulted from a cooperative study by government officials, and was

aimed at giving broad discretion to the various agencies in order that they might obtain only the necessary jurisdiction. [Footnote omitted]. The Act created a definite method of acceptance of jurisdiction so that all persons could know whether the government had obtained "no jurisdiction at all, or partial jurisdiction, or exclusive jurisdiction." (319 U.S. at 314, 63 S.Ct. at 1123).

633 (1963). As already indicated, such burden was not met by the appellant.

■ Accordingly, we do not think it unreasonable to require proof of such acceptance in the current case. In analogous situations, other states have reached similar results. *See State v. Johnson*, supra, *Richardson v. Turner*, supra, *Dobbins v. State*, supra, *People v. Sullivan*, supra, *Kansas City v. Garner*, supra. Therefore, we hold that in the absence of an affirmative showing of the acceptance of exclusive jurisdiction by the federal government, the state retained criminal jurisdiction over the land here involved.

## II. SELECTIVE PROSECUTION

Appellant's second question is really a selective prosecution argument. It is based upon the alleged existence of duties on the part of others to report that persons had been left on the desert. In this regard, appellant points to the survivors who walked out of the desert, the Air Force personnel who allegedly saw the men scatter when the helicopter flew overhead, and the Sheriff's Department Personnel who refused to immediately act upon the information which they had about survivors in the desert. In other words, appellant argues that he cannot be convicted for causing deaths by criminal negligence, since others were as negligent, or more so, than he.

■ This argument has no merit. The jury was carefully instructed as to causation and counsel raised no objection to those instructions. In addition, the record strongly supports the verdict of the jury that the appellant caused the deaths of his employees by his criminal negligence. The fact that others were negligent or criminally negligent is a matter for the county attorney and not relevant here. Such allegations do not constitute defense matter and appellant cites no creditable authority in support of his argument.

## III. APPELLANT'S SILENCE

The prosecutor introduced testimony about appellant's silence upon being arrested as evidence of his criminal negligence.

The prosecutor told the jury that the appellant had an obligation to tell the Air Force, or the FBI, or the sheriff, that other persons were on the desert. The state's argument is that appellant's constitutional right against self-incrimination was superseded, or out-balanced, by the duty of care imposed by the manslaughter statute. The evidence of appellant's silence was introduced over proper objection.

A recent U. S. Supreme Court opinion has, we believe, undercut the legitimacy of the state's position. In *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), the defendants said nothing after they were arrested. At their trial, however, the defendants took the stand and testified that they had been framed. On cross-examination, the prosecutor sought to impeach the defendants by questioning them about their failure to tell this story to the police when they first were arrested. Defendants were convicted. On appeal to the U. S. Supreme Court, the convictions were reversed. Writing the opinion for the majority, Mr. Justice Powell held that the use of the defendants' post-arrest silence in this manner violates due process. Emphasizing the requirements of *Miranda*, infra, Justice Powell said:

> Silence in the wake of those warnings may be nothing more than the arrestee's exercise of these *Miranda* rights. Thus, every post-arrest silence is insolubly ambiguous because of what the State is required to advise the person arrested. [Footnote and citation omitted]. Moreover, while it is true that the *Miranda* warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings. In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial. (*Doyle*, supra, 426 U.S. at 617–618, 96 S.Ct. at 2244–2245, 49 L.Ed.2d at 97–98).

■ The opinion says that, once a defendant has been told his rights under *Mi-*

*randa* and chooses to remain silent, his exercise of the right to remain silent cannot be used to incriminate him. Therefore, it is our opinion that the fact of appellant's silence cannot be used as evidence of his criminal negligence.

We do not believe that it is significant that the crime for which appellant's silence has been used as evidence (involuntary manslaughter) is different from the crime for which appellant had been given his *Miranda* warning (a federal larceny charge), since there is no way that appellant could have warned about the men remaining on the desert without succeeding in incriminating himself on the federal charge.

The rule excluding evidence of silence is not new to Arizona. Our Supreme Court has indicated that a prosecutor cannot comment upon the failure of a defendant to give a complete explanation at the scene of a crime. *State v. Raffaele*, 113 Ariz. 259, 550 P.2d 1060 (1976). The weakness of the defendant's position in *Raffaele* was that he did make a statement to the police after having been arrested.

Similarly, in *State v. Simoneau*, 98 Ariz. 2, 401 P.2d 404 (1965), the problem of a defendant's silence was in issue. In *Simoneau*, the complaining witnesses picked the defendant out of a line-up. The county attorney, in his opening statement, remarked that the defendant did not deny having committed the offense after having been pointed out in the line-up. Subsequently, the county attorney introduced evidence which substantiated the opening statement.

Our Supreme Court in *Simoneau* agreed with the defendant's contention that this was an attempt to infer a tacit admission of guilt from his silence, and said:

> We . . . do not approve the introduction of evidence of an accused's silence in reply to questions when he is in custody or under other circumstances where it is his constitutional right to refrain from incriminating himself under the Fifth Amendment to the Constitution of the United States (98 Ariz. at 6, 401 P.2d at 407).

We hold that it was reversible error for the prosecutor to introduce evidence of appellant's silence under the circumstances of this case.

## IV. MIRANDA WARNINGS

█ Appellant also argues that certain statements which he made to Col. Milian of the Air Force, shortly after appellant was arrested, should not have been admitted, since appellant had not been given a post-arrest warning pursuant to the requirements of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

The statement complained of came into evidence through the testimony of Col. Milian:

Q And in filling out these papers, did you obtain the names of the persons that you had picked up on the Air Force Base or the gunnery range?

A That's right. There was [sic] the ones from range four plus Mr. Dykes.

Q Did you make any statement at that time to those persons you picked up on range four?

A Right. Because I made the statement that it looked like a family affair because there was [sic] three of the Karnachs (phonetic) and there were, I believe, two others that had similar names.

Q And did Mr. Dykes at that time make a statement?

A Yes, he made the statement that it looks like, "I'm the only one that works alone."

We agree with appellee's analysis that appellant's statement was voluntary and spontaneous, and that no compulsion whatsoever was involved. The mere fact that appellant was in custody when he made this remark does not make it inadmissible. Therefore, the statement does not fall within the prohibitions of *Miranda*, supra. *See State v. Small*, 20 Ariz.App. 530, 514 P.2d 283 (1973).

The judgment and sentence are reversed, and this matter is remanded for a new trial consistent with this opinion.

HAIRE and NELSON, JJ., concurring.