**UNITED STATES v. YEE NGEE HOW.**

No. 33097.

United States District Court,
N. D. California, S. D.

June 12, 1952.

518

Chauncey Tramutolo, U. S. Atty., and Robert J. Drewes, Asst. U. S. Atty., San Francisco, Cal., for plaintiff.

Jerome Sapiro, San Francisco, Cal., for defendant.

OLIVER J. CARTER, District Judge.

Yee Ngee How, under indictment for violation of Title 21 U.S.C.A. § 174, seeks by petition to this court to suppress as evidence in any criminal proceeding against him a quantity of opium taken from him by representatives of the Customs Service of the United States. The petitioner has also presented his motion to dismiss the indictment against him upon the theory that if his petition to suppress the opium is granted there will remain insufficient evidence to support such an indictment.

Suppression of this evidence is sought upon the ground that it was obtained through an unlawful search and seizure, contrary to the guarantees of the Fourth and Fifth Amendments to the United States Constitution. The facts, as gathered from affidavits and oral testimony, are as follows:

On December 3, 1951 petitioner, in the course of going ashore from the USNS C. G. Morton, a naval transport ship, upon which he was employed and which had just arrived in San Francisco from Japan, was stopped and searched by Port Patrol Officer Phillips of the United States Customs Service. This search was made without a warrant and was not conducted upon the theory that petitioner was an individual under suspicion of then having opium in his possession. However, Officer Phillips had been instructed to give as much attention as pos-

sible to persons boarding or leaving the USNS C. G. Morton because civilian crew members of naval transports were suspected of engaging in the illegal importation of contraband drugs. Just prior to searching petitioner, Officer Phillips had inspected another person identified as a crew member enroute ashore. The Officer stated to the court, at the time of hearing argument on this matter, that this search was a routine general search without regard to whether or not persons searched had previously been subjected to a Customs inspection.

The search itself was conducted on Pier 3 in San Francisco, California, at some point in between the gangway of the ship and the pier gate which opened out onto the public streets of the city. Before petitioner was searched he told Officer Phillips, in response to questions, that he was a member of the crew of the USNS C. G. Morton, and that he was not carrying off any contraband or undeclared articles. The search which followed revealed that petitioner was carrying in his hip pocket a lump of material which the searching officer suspected to be opium. Later, chemical analysis proved the material to be prepared smoking opium.

Petitioner, after being informed that he was being held for further investigation, offered Officer Phillips a bribe of $500 to release him. Shortly thereafter Customs Agent Kahler was summoned to the scene. He identified petitioner as being a person then under investigation by the Collector of Customs, the Customs Agency Service, and the District Supervisor of Narcotics because of suspected activities in the smuggling and sale of illicit narcotics. At this time Agent Kahler ordered a more thorough search of petitioner's person. This search resulted in the discovery of two more lumps of opium, lashed to petitioner's body beneath his clothing.

Petitioner contends that these searches of his person contravene his constitutional rights. This contention rests upon the argument that these searches cannot be construed as Customs inspections of persons coming into the United States from foreign countries pursuant to Title 19 U.S.C.A. § 1582. It is his theory that because his person, his baggage, and his living and work-

ing quarters aboard the USNS C. G. Morton had been inspected by Customs officers the previous day, and because he had been allowed to leave the ship after those initial inspections and enter the city of San Francisco, he could not be subjected to further searches of his person or effects by Customs officers except under the authority of a lawfully issued warrant or upon probable cause that he was engaged in the commission of, or had already committed, a crime.

██ The Fourth Amendment prohibits not all searches and seizures, but only those which are "unreasonable."[1] The Constitution does not define what are "unreasonable" searches, and that determination cannot be made through the application of any fixed formula. United States v. Rabinowitz, 339 U.S. 56, 63, 70 S.Ct. 430, 94 L.Ed. 653. Reasonableness is not a matter of abstract theory, but a pragmatic question, to be determined, in each case, in the light of its own circumstances. Go-Bart Importing Co. v. United States, 282 U.S. 344, 357, 51 S.Ct. 153, 75 L.Ed. 374. The distinction between a reasonable search and one which is unreasonable, is to be drawn, in each case, in the light of what was deemed reasonable or unreasonable at the time when the Amendment was adopted, and in a manner which will conserve the public interest as well as the interest and rights of individual citizens. Carroll v. United States, 267 U.S. 132, 149, 45 S.Ct. 280, 69 L.Ed 543.

██ If a search is valid there is nothing in the Fourth Amendment which in-

hibits the seizure by law enforcement agents of property, the possession of which is a crime, even though the officers are not aware that such property is on the person when the search is initiated. Harris v. United States, 331 U.S. 145, 155, 67 S.Ct. 1098, 91 L.Ed. 1399. The opium taken from the defendant was properly seized by the searching customs officials.[2] Even though contraband articles may be suppressed as evidence when they have been taken from a person by constitutionally-prohibited search, they cannot be returned to such person. Trupiano v. United States, 334 U.S. 699, 68 S.Ct. 1229, 92 L.Ed. 1663; United States v. Jeffers, 342 U.S. 48, 72 S.Ct. 93.

Searches of persons coming into the United States from a foreign country are in a specialized category, readily distinguishable from such searches generally. This distinction was recognized in Boyd v. United States, 116 U.S. 616, 6 S.Ct 524, 528, 29 L.Ed 746, the fountainhead case on the subject of searches and seizures. 116 U.S. at page 623, 6 S.Ct. at page 528, 29 L.Ed 746, the court there said:

"The search for and seizure of stolen or forfeited goods, or goods liable to duties and concealed to avoid the payment thereof, are totally different things from a search for and seizure of a man's private books and papers for the purpose of obtaining information therein contained, or of using them as evidence against him. The two things differ toto coelo. In the one

---

1. So held by Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543, which discusses (in order listed) Boyd v. United States, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746; Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652; Silverthorne Lumber Co. v. United States, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319; Gouled v. United States, 255 U.S. 298, 41 S.Ct. 261, 65 L.Ed. 647; Amos v. United States, 255 U.S. 313, 41 S.Ct. 266, 65 L.Ed. 654; Cotzhausen v. Nazro, 107 U.S. 215, 2 S.Ct. 503, 27 L.Ed. 540; American Fur Co. v. United States, 2 Pet. 358, 7 L.Ed. 450. See also: Hester v. United States, 265 U.S. 57, 44 S.Ct. 445, 68 L.Ed. 898; Husty v. United States, 282 U.S. 694, 51 S.Ct. 240, 75 L.Ed. 629; Davis v. United

States, 328 U.S. 582, 66 S.Ct. 1256, 90 L.Ed. 1453; Harris v. United States, 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399; Brinegar v. United States, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879; United States v. Rabinowitz, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653.

2. 21 U.S.C.A. § 173 makes illegal any and all importation of smoking opium, and makes any such opium found within the United States subject to seizure and forfeiture without the necessity of proceedings of any character. 21 U.S.C.A. § 181 creates the presumption that all smoking opium found within the United States has been "imported contrary to law". See Pon Wing Quong v. United States, 9 Cir., 111 F.2d 751.

case, the government is entitled to the possession of the property; in the other it is not. The seizure of stolen goods is authorized by the common law; and the seizure of goods forfeited for a breach of the revenue laws, or concealed to avoid the duties payable on them, has been authorized by English statutes for at least two centuries past; and the like seizures have been authorized by our own revenue acts from the commencement of the government. The first statute passed by congress to regulate the collection of duties, the act of July 31, 1789 [1 Stat. at L. 43], contains provisions to this effect. As this act was passed by the same congress which proposed for adoption the original amendments to the constitution, it is clear that the members of that body did not regard searches and seizures of this kind as "unreasonable," and they are not embraced within the prohibition of the amendment."

■ Neither a warrant nor an arrest is needed to search in these circumstances; and the search which customs officials are authorized to conduct upon entry is of the broadest possible character. Landau v. United States, 2 Cir, 82 F.2d 285, 286, certiorari denied 298 U.S. 665, 56 S.Ct. 747, 80 L.Ed 1389.[3] That all persons entering the United States from outside might be searched without the necessity of probable cause was recognized in Carroll v. United States, supra.[4] The court there said, 267 U.S. at page 154, 45 S.Ct. at page 285, 69 L.Ed. 543.

"Travelers may be so stopped in crossing an international boundary because of national self-protection reasonably requiring one entering the country to identify himself as entitled to come in, and his belongings as effects which may be lawfully brought in."

The power of customs officials to make such searches has three sources of statutory authority. The material portions of those statutes are quoted below:

Title 19 U.S.C.A. § 1581. "(a) Any officer of the customs may at any time go on board of any vessel or vehicle at any place in the United States * * * and examine, inspect, and search the vessel or vehicle and every part thereof and any person, trunk, package, or cargo on board, and to this end may hail and stop such vessel or vehicle, and use all necessary force to compel compliance."

Title 19 U.S.C.A. § 1582. "The Secretary of the Treasury may prescribe regulations for the search of persons and baggage * * *; and all persons coming into the United States from foreign countries shall be liable to detention and search by authorized officers or agents of the Government under such regulations."

Title 19 U.S.C.A. § 482. "Any of the officers or persons authorized to board or search vessels may stop, search, and examine * * * any vehicle, beast, or person, on which or whom he or they shall suspect there is merchandise which is subject to duty, or shall have been introduced into the United States in any manner contrary to law, * * * and to search any trunk or envelope, wherever found, in which he may have a reasonable cause to suspect there is merchandise which was imported contrary to law; * * *"

Petitioner's theory of the law is that the right of customs officials to search his person as one entering the United States from a foreign country was exhausted on December 2, 1951. He reasons that because after being searched on that day he was allowed to leave the ship and enter the city of San Francisco he had "passed the barrier."

This point of view as to what constitutes "the barrier" is erroneous. For the purposes of enforcing the customs laws of the United States, "the barrier" is located somewhere between the ship which has arrived from a foreign country and the public streets of the port city where it is docked.

---

3. For further discussion of searching powers of customs officials see Hoxie v. United States, 9 Cir., 15 F.2d 762; The Atlantic, 2 Cir., 68 F.2d 8.

4. The Atlantic, 2 Cir., 68 F.2d 8, 10, held that probable cause was not required in order to search vessels arriving in the United States from a foreign country.

There is no fixed line, ascertainable by survey, as there is between the United States and Mexico. Rather "the barrier" is the point where customs officials elect to search persons or goods coming from the ship before they are allowed to pass out into the public streets of the city. Persons and goods "enter the United States" from the ship which has arrived from a foreign country. The ship itself remains on the "other side" of "the barrier" during the entire time it is discharging persons and cargo. Every time a person boards that ship he places himself in a position of being subject to a customs inspection when he leaves the ship.

Nor is this a discriminatory classification, as contended by petitioner. The searches which customs officials are authorized to make are designed to locate concealed goods which are contraband or subject to duty. It might be possible to so skillfully hide an article aboard a ship that a complete dismantling of the vessel in drydock would be required to locate it. The ease with which some articles lend themselves to successful concealment was recognized by the Court of Appeals of the Seventh Circuit in United States v. Thomson, 7 Cir., 113 F.2d 643, where at page 645, 129 A.L.R. 1291, it was said:

"The smuggled diamond may be so skillfully concealed that much time is required for the searching officers to locate it, whereas the defendant may be sitting in his still house surrounded by vats of liquor, in the second search, and no time at all required to complete the search. In other words, the reasonableness of the search depends upon the facts in each case, and this applies to the length of the search and the quantity seized."

The fact that petitioner had been once searched previous to the day upon which the opium was discovered did not exhaust the time limit applicable to a valid customs inspection.

Nor is it logical to suppose that a crew member, in the course of smuggling contraband, will remove his goods from the ship in the course of his first trip into the city. A ship presents a much more complex problem to government agents charged with preventing smuggling than does any other type of conveyance in which men and goods cross the international boundary. Initially, the size and intricate construction of a ship create more hiding places for contraband than does an automobile, an aircraft, a steed, or a train. This fact makes it more difficult to conduct a thorough search of the vessel immediately after arrival.

The bottleneck, so far as the smuggler is concerned, is getting his contraband ashore. The most practical way for customs officials to discover such contraband is to set up a gauntlet between the ship and shore, through which must pass all persons and goods leaving the ship. The usual construction of waterfront facilities lends itself quite naturally to the accomplishment of this purpose.

Petitioner's view is that customs officials have the right to but one search. Once that search is completed, he argues, there can be no further search of his person or effects without a warrant or probable cause. This contention is in the teeth of Section 1581.[5] That Section grants customs officials the right to stop or board ships "at any time" and search the ship and persons and baggage thereon. But, says petitioner, this statute cannot apply to the search which discovered his opium because that search was made, not on a "vessel" but on a "pier" and the statute speaks in terms of "boarding a vessel" to search. If petitioner's theory of construction were adopted it would follow that Officer Phillips could have searched petitioner the moment before he walked down the gangway or could have waited on the ship and searched him the minute his foot struck the deck upon his return. To hold that a person could be searched on board the vessel but not while he stood on the pier to which the vessel was tied up would achieve an absurd result, and one inconsistent with the purpose of the statute.

---

5. There is no requirement of probable cause for a search conducted under the authority of 19 U.S.C.A. § 1581. The Atlantic, 2 Cir., 68 F.2d 8, 10.

A reading of this Section in conjunction with Section 1582 indicates that it was the intention of Congress to create a broad authority for customs officials to conduct reasonable searches necessary to the enforcement of customs laws. Strict construction should not be permitted to defeat the policy and purposes of the statute. Ash Sheep Co. v. United States, 252 U.S. 159, 40 S.Ct. 241, 64 L.Ed. 507.[6] Here, for the purposes of a statute designed to effectuate enforcement of the customs laws, the word "vessel" includes the pier to which a vessel is tied up. The "spirit" of the law controls the "letter" when the two are in conflict. Holy Trinity Church v. United States, 143 U.S. 457, 12 S.Ct. 511, 36 L.Ed. 226. Special attention must be given evils which a statute is designed to overcome, and the statute should be interpreted so as to effectuate, rather than destroy, it. Janof v. Newsom, 60 App.D.C. 291, 53 F.2d 149, and cases there cited. An evil toward which Section 1581 was aimed is smuggling. The interpretation here adopted tends to effectuate the Congressional purpose of preventing that evil, whereas that urged by petitioner would tend to destroy that purpose.

Even if it were held that Section 1581 was to be interpreted literally, so that customs officials could "at any time" search persons on the "vessel," but not on the "pier," the result would be to fortify the construction that "the barrier is crossed" on boarding or leaving the ship.

Likewise the court rejects petitioner's argument that the second search could not be made under the authority of Section 1582 because the terms of the statute permit only the searching of "persons coming into the United States from foreign countries". The fact that petitioner had entered San Francisco before this search did not cause him to lose the status specified in the words of the statute. The rules of construction used to interpret Section 1581 override petitioner's contention that Section 1582 cannot be applied to him.

There remains one more "statutory" argument to be disposed of. This is made in connection with Section 482. Petitioner maintains that this Section cannot give validity to the search. He bases this conclusion upon the premise that Section 482 limits searches which it allows to those based on probable cause. The right to search persons was made dependent upon such person being one "on * * * whom he * * * shall suspect there is merchandise which * * * shall have been introduced into the United States in any manner contrary to law". Here Officer Phillips suspected that some member of the crew of the USNS C. G. Morton was smuggling narcotics. Before searching petitioner, he ascertained that he was a member of the crew of that ship. The suspicion held by Officer Phillips at that time was sufficient to meet the requirements of the statute.

Petitioner buttresses his attack upon the Constitutionality of the instant search with language from Landau v. United States, supra. The court there, in upholding the searching of a person disembarking from a ship just arrived from a foreign country, 82 F.2d at page 286, said:

"In the instant case, there was no disturbance of the appellant, his residence or his effects after a completed entry. It was to these evils that the Fourth Amendment was directed."

A "completed entry" is claimed by petitioner by virtue of the fact that he was allowed to leave the ship and enter San Francisco on the day previous to this

---

**6.** Statutes to prevent frauds upon the revenue are considered as enacted for the public good, and to suppress a public wrong, and therefore, although they impose penalties or forfeitures, are not to be construed, like penal laws generally, strictly in favor of the defendant; but they are to be fairly and reasonably construed, so as to carry out the intention of the legislature. United States v. Stowell, 133 U.S. 1, 12, 10 S.Ct. 244, 33 L.Ed. 555. See also: Johnson v. Southern Pacific Co., 196 U.S. 1, 17, 25 S.Ct. 158, 49 L.Ed. 363; United States v. A. Graf Distilling Co., 208 U.S. 198, 199, 205–206, 28 S.Ct. 264, 52 L.Ed. 452; United States v. Ryan, 284 U.S. 167, 172, 52 S.Ct. 65, 76 L.Ed. 224.

search. Had the petitioner or his possessions been searched while he was off the ship and within the city, the situation would have been different; but this was not done. Once petitioner returned to the ship on which were located his living quarters, and where his baggage had been left, he "recrossed the barrier." When he again left the ship to go into San Francisco he was, for the purposes of a customs inspection, a person coming into the United States from a foreign country.

For the reasons stated, the petition to suppress evidence and the motion to dismiss the indictment should be and the same are hereby denied.