UNITED STATES of America,
Plaintiff-Appellee,

v.

Scott Alan SANDLER,
Defendant-Appellant.

No. 79–5314.

United States Court of Appeals,
Fifth Circuit.

May 15, 1981.

---

Gene P. Hines, Washington, D. C., for defendant-appellant.

Atlee W. Wampler, III, U. S. Atty., Joel N. Rosenthal, Asst. U. S. Atty., Miami, Fla., for plaintiff-appellee.

Before GODBOLD, Chief Judge, BROWN, AINSWORTH, CHARLES CLARK, RONEY, GEE, TJOFLAT, HILL, FAY, RUBIN, VANCE, KRAVITCH, FRANK M. JOHNSON, JR., GARZA, HENDERSON, REAVLEY, POLITZ, HATCHETT, ANDERSON, RANDALL, TATE, SAM D. JOHNSON, THOMAS A. CLARK and WILLIAMS, Circuit Judges.*

VANCE, Circuit Judge:

On April 4, 1979 Scott Alan Sandler was convicted in the United States District Court for the Southern District of Florida of importation into the United States of approximately 888 grams of cocaine in vio-lation of 21 U.S.C. § 952(a). Sandler's conviction followed his arrest on the morning of September 30, 1978 by Customs Control Officer Joel Ariel at the Miami International Airport after a pat-down search and search of Sandler's boots revealed packages of cocaine taped to each of his legs. The events leading up to the search as accurately described in the opinion of a panel of this court, 625 F.2d 537, are set forth in the margin.[1]

Sandler moved to suppress the evidence seized from him, and statements made by him following his arrest. His motion was denied by the U.S. Magistrate. The ruling was appealed to the district court and affirmed. Following his conviction Sandler challenged the district court's ruling in his appeal to this court.[2] A divided panel of this court concluded that the standard for determining the validity of a body search conducted at the border is reasonable suspicion. It reversed Sandler's conviction because of its holding that the facts in this case do not support the required reasonable suspicion. We vacated the panel opinion and sitting *en banc* now review the applicable standard.[3]

**I**

From the outset Congress recognized the unique character of a border situation. In

---

* Coleman, Circuit Judge, elected not to participate in the consideration or decision of this appeal.

1. Ariel was on duty at Miami International Airport observing incoming international passengers in the customs baggage enclosure. He was looking for possible smugglers. He observed Sandler wearing full-cut trousers over new-looking boots and walking in a stiff manner. Ariel first saw Sandler waiting for his baggage and then again while customs inspectors examined his baggage. Ariel noted that Sandler shifted from foot to foot while waiting.

   While observing Sandler, Ariel also watched several other persons. Ariel testified that he "floated" around the customs enclosure and actually observed Sandler for only thirty to sixty seconds prior to stopping and detaining him.

   As a customs inspector examined Sandler's baggage, Ariel asked "How does it look?", to which the inspector replied, "It looks good, coming from South America and on tour." Ariel interpreted this reply to mean that Sandler was a good prospect for secondary examination. As Sandler removed his baggage from the inspection belt, Ariel approached him and requested a customs declaration card. Sandler presented both his declaration card and passport. The passport showed that Sandler had travelled to Bolivia and Peru. Ariel then asked Sandler to accompany him to his office where a pat-down search and an inspection of Sandler's legs were conducted. The search revealed the cocaine taped to Sandler's legs.
   625 F.2d 538.

2. Sandler raised other issues on appeal which are without merit.

3. Because of our disposition of this case, we do not review the trial court's determination that reasonable suspicion was present.

the first revenue act the same Congress that proposed the fourth amendment asserted the plenary power of customs officials to search any ship for concealed goods, wares and merchandise. Act of July 31, 1789, ch. 5, § 24, 1 Stat. 43.[4]

■ 19 U.S.C. § 1582 now provides that "all persons coming into the United States from foreign countries shall be liable to detention and search by authorized officers or agents of the Government under [Treasury] regulations." The authority to conduct searches at the border is granted to customs officers by 19 U.S.C. § 482 which provides that such officers "may stop, search and examine, any vehicle, beast or person, on which or whom he or they shall suspect there is merchandise which is subject to duty, or shall have been introduced into the United States in any manner contrary to law . . . ." This broad grant of authority, subject to no express limitations, places border searches in a category apart from other searches. The statute is, of course, subject to the constitutional test of reasonableness. *United States v. Poindexter*, 429 F.2d 510, 512 (5th Cir. 1970); *Thomas v. United States*, 372 F.2d 252, 254 (5th Cir. 1967). However, "[t]hese searches . . . are deemed reasonable simply by virtue of the fact that they occur at the border." *United States v. Richards*, 638 F.2d 765, 770 (5th Cir. 1981). We have thus held with respect to vehicle searches made pursuant to this statutory authority that "mere" suspicion alone is sufficient to meet the constitutional standard, *Morales v. United States*, 378 F.2d 187, 189 (5th Cir. 1967). Indeed, in *United States v. Bowman*, 502 F.2d 1215 (5th Cir. 1974) we stated that "At the border itself, the search of an incoming person or vehicle may be initiated on little or no suspicion. The agent's statutory authority to search is virtually unfettered except perhaps as to due process concerning the manner, not the cause of the search.' *United States v. Storm*, 5 Cir. 1973, 480 F.2d 701, 704." 502 F.2d at 1218–19.

Other circuits have taken the same view. "Searches made at the border . . . are reasonable simply by virtue of the fact that they occur at the border." *United States v. Carter*, 592 F.2d 402, 404 (7th Cir.), *cert. denied*, 441 U.S. 908, 99 S.Ct. 2001, 60 L.Ed.2d 378 (1979). " '[T]here is reasonable and probable cause to search every person entering the United States from a foreign country, by reason of such entry alone.' " *United States v. Rivera-Marquez*, 519 F.2d 1227, 1228 (9th Cir.), *cert. denied*, 423 U.S. 949, 96 S.Ct. 369, 46 L.Ed.2d 285 (1975), (quoting *Witt v. United States*, 287 F.2d 389, 391 (9th Cir.), *cert. denied*, 366 U.S. 950, 81 S.Ct. 1904, 6 L.Ed.2d 1242 (1961)). "Typically, mere suspicion of possible illegal activity within their jurisdiction is enough 'cause' to permit a customs officer to stop and search a person." *United States v. Glaziou*, 402 F.2d 8, 12 (2d Cir. 1968), *cert. denied*, 393 U.S. 1121, 89 S.Ct. 999, 22 L.Ed.2d 126 (1969).

The policy behind this principle was stated by the Supreme Court in *Carroll v. United States*, 267 U.S. 132, 154, 45 S.Ct. 280, 69 L.Ed. 543 (1925) as follows:

> Travelers may be so stopped in crossing an international boundary because of national self protection reasonably requiring one entering the country to identify himself as entitled to come in, and his belongings as effects which may be lawfully brought in.

The Court has explicitly recognized that searches of persons as well as searches of packages at our national boundaries rest on different rules of constitutional law than do domestic regulations. "The Constitution gives Congress broad, comprehensive powers '[t]o regulate Commerce with foreign Nations.' Art. 1, § 8, cl. 3. Historically such broad powers have been necessary to prevent smuggling and to prevent prohibited articles from entry." *United States v. 12 200-Ft. Reels of Super 8MM. Film*, 413

---

4. The amount of annual revenue from customs demonstrates the importance of this concern. In *United States v. Ingham*, 502 F.2d 1287, 1291 n.5 (5th Cir. 1974), *cert. denied*, 421 U.S. 911,

95 S.Ct. 1566, 43 L.Ed.2d 777 (1975) we noted that in the one fiscal year under consideration the amount exceeded four billion dollars.

U.S. 123, 125, 93 S.Ct. 2665, 2667, 37 L.Ed.2d 500 (1973). Although it has not squarely confronted the question now before us, dicta in several Supreme Court decisions recognize the federal power to routinely inspect and search packages and persons crossing the borders of this country. In *Almeida-Sanchez v. United States*, 413 U.S. 266, 272, 93 S.Ct. 2535, 2539, 37 L.Ed.2d 596 (1973) the Court in considering the constitutionality of a search opined that the federal power to exclude aliens from the country "can be effectuated by routine inspections and searches of individuals or conveyances seeking to cross over borders." Subsequently, in *United States v. Brignoni-Ponce*, 422 U.S. 873, 887, 95 S.Ct. 2574, 2583, 45 L.Ed.2d 607 (1975) Justice Rehnquist in his concurring opinion explained that "travelers entering the country may be stopped and searched without probable cause and without founded suspicion, because of 'national self protection . . . .' "

In *United States v. Ramsey*, 431 U.S. 606, 97 S.Ct. 1972, 52 L.Ed.2d 617 (1977) the Court was dealing with searches of international mail that has reached our borders. In doing so, however, it reviewed the constitutional and historical foundation of border searches beginning in 1789. The Court recognized that the fourth amendment denounces only those searches that are unreasonable. *Id.* at 617, 618, 97 S.Ct. at 1979. It expressly reaffirmed the principle that

> Border searches, then, from before the adoption of the Fourth Amendment, have been considered to be "reasonable" by the single fact that the person or item in question had entered into our country from outside.

*Id.* at 619, 97 S.Ct. at 1980.

■ While holding that the customs "agents' 'mere suspicion' of possible illegal activity is enough cause to justify a border search," *United States v. Warner*, 441 F.2d 821, 832 (5th Cir.), *cert. denied*, 404 U.S. 829, 92 S.Ct. 65, 30 L.Ed.2d 58 (1971), we have insisted that limits exist on the *scope* of a routine search. Development of this point in the circuit has largely centered on searches commonly referred to as strip searches: examination of the person after removal of inner clothing but not including a search of body cavities. The rule which has become well established is that requirements of the fourth amendment are met if the search is supported by "reasonable suspicion" on the part of the customs agent. In the formulation of that standard we rejected the contentions that would require either probable cause, *Perel v. Vanderford*, 547 F.2d 278, 280 (5th Cir. 1977), or the "real suspicion" that has been adopted by the ninth circuit. *United States v. Smith*, 557 F.2d 1206, 1208 (5th Cir. 1977), *cert. denied*, 434 U.S. 1073, 98 S.Ct. 1259, 55 L.Ed.2d 777 (1978).

In *United States v. Himmelwright*, 551 F.2d 991 (5th Cir.), *cert. denied*, 434 U.S. 902, 98 S.Ct. 298, 54 L.Ed.2d 189 (1977) the panel noted that

> "reasonableness" in the fourth amendment sense always depends upon a balance which must be struck between, on the one hand, the level of official intrusion into individual privacy and, on the other hand, the public interest to be served by such an intrusion.

551 F.2d at 994. The emerging rule, peculiarly applicable to border situations is a reflection of the recognition by this and other courts of our national interests in self-protection and protection of tariff revenue, balanced against the privacy rights of the individual traveler.

The reasonable suspicion test as applied by this court is a flexible one. As we stated in *United States v. Afanador*, 567 F.2d 1325, 1328 (5th Cir. 1978),

> "the greater the intrusion, the greater must be the reason for conducting a search that results in such invasion" . . . .
> Thus, what constitutes "reasonable suspicion" to justify a particular search may not suffice to justify a more intrusive or demeaning search. (citations omitted.)

Many of our strip search cases have been largely concerned with the application of this flexible standard under varying facts. *See United States v. Walters*, 591 F.2d 1195 (5th Cir.), *cert. denied*, 442 U.S. 945, 99 S.Ct. 2892, 61 L.Ed.2d 317 (1979); *United States*

*v. Carter*, 590 F.2d 138 (5th Cir.), *cert. denied*, 441 U.S. 908, 99 S.Ct. 2001, 60 L.Ed.2d 378 (1979); *United States v. Rieves*, 584 F.2d 740 (5th Cir. 1978); *United States v. Barger*, 574 F.2d 1283 (5th Cir. 1978); *United States v. Olcott*, 568 F.2d 1173 (5th Cir. 1978); *United States v. Afanador*, 567 F.2d 1325 (5th Cir. 1978); *United States v. Smith*, 557 F.2d 1206 (5th Cir. 1977), *cert. denied*, 434 U.S. 1073, 98 S.Ct. 1259, 55 L.Ed.2d 777 (1978); *United States v. Chavarria*, 493 F.2d 935 (5th Cir. 1974); *United States v. Forbicetta*, 484 F.2d 645 (5th Cir. 1973), *cert. denied*, 416 U.S. 993, 94 S.Ct. 2404, 40 L.Ed.2d 772 (1974).

## II

■ This case presents us with the question of whether a "pat-down" or other less intrusive border search must, like a strip search, rest on reasonable suspicion. In our previous cases on this issue, the court found that reasonable suspicion was present, and therefore did not make a detailed inquiry into the appropriate standard. *United States v. Rice*, 635 F.2d 409 (5th Cir. 1981); *United States v. Klein*, 592 F.2d 909 (5th Cir. 1979); *United States v. Chiarito*, 507 F.2d 1098 (5th Cir.), *cert. denied*, 423 U.S. 824, 96 S.Ct. 38, 46 L.Ed.2d 40 (1975). Where an airline passenger was compelled to empty his pockets, disclosing contraband, we "h[e]ld that those who actually present themselves for boarding on an air carrier, like those seeking entrance into the country, are subject to a search based on mere or unsupported suspicion." *United States v. Skipwith*, 482 F.2d 1272, 1276 (5th Cir. 1973). We have never, though, specifically addressed the standard to be applied in pat-down searches at the border. We now hold that "mere suspicion" is enough for these searches, that is, that they are a part of routine border inspection.

In applying the balancing test described in *Himmelwright* and *Afanador*, we think the key variable is the invasion of the privacy and dignity of the individual. A strip search, and even more a body cavity or

stomach search, entails at the very least embarrassment to the person involved. It presents a degree of intrusion which requires more than mere suspicion to justify. However, we do not find a comparable degree of intrusiveness in a simple frisk or pat-down.[5] A frisk invokes relatively little indignity or embarrassment. It can be conducted on a public street, *see Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). It is neither painful nor dangerous. Whatever the stigma attached to a pat-down in other contexts, we think that during a border inspection it is no worse than having a stranger rummage through one's luggage, a practice which is clearly acceptable. Other circuits agree. The second circuit, for instance, adheres to the rule that before an official may insist upon such an extensive invasion of privacy as a strip search he should have a suspicion of illegal concealment that is substantial enough to make the search a reasonable exercise of authority. *United States v. Asbury*, 586 F.2d 973, 975 (1978). Short of a strip search, however, that court has applied a wholly different standard. Thus, in *United States v. Nieves*, 609 F.2d 642, 646 (2d Cir. 1979), *cert. denied*, 444 U.S. 1085, 100 S.Ct. 1044, 62 L.Ed.2d 771 (1980) it upheld a border search in which the defendant was patted down and told to remove his shoe. In its opinion, the court said that,

we have recognized that a number of other Circuits have held that the term "personal effects" includes a person's outer clothing as well as the contents of pockets, purse or wallet. *See Asbury, supra*, at 975 n.2. Thus, not every request that a person remove an article of clothing or remove objects from an article of clothing will result in the automatic transformation of a routine search of belongings and effects into a strip search. We also note that several Circuits have held that the removal and search of a person's shoes at a border checkpoint does not amount to a strip search, but rather is

---

**5.** We recognize that a non-routine, offensive pat-down of the person could occur. Sandler's search, however, does not present such a situa-

tion and we do not now reach it except to differentiate it from the ordinary type of examination of the person which we approve today.

an acceptable procedure in a routine border inspection for which no justification is needed beyond the fact that the person involved has just crossed our national boundary.

We find the reasoning expressed by these Circuits, which analogizes the removal of a shoe to the removal of an outer garment, to be persuasive. We do not believe that the relative degree of embarrassment or indignity that a person is likely to suffer as a result of complying with a request to remove his shoes is sufficient to warrant the imposition of a "reasonable suspicion" requirement as a precondition to such a request in a standard border search context. Accordingly, we hold that the search of Nieves's shoes was an acceptable routine border inspection procedure, and that this search needed no justification beyond that provided by Nieves's decision to cross our national boundary.

609 F.2d at 646 (footnotes omitted).

The seventh circuit in *United States v. Carter*, 592 F.2d at 405, characterized as "routine" a search in which the defendant had been requested to empty his pockets and remove both his overcoat and his suitcoat for inspection. For such an investigation no particular suspicion was required. In *United States v. Fitzgibbon*, 576 F.2d 279 (10th Cir.), *cert. denied*, 439 U.S. 910, 99 S.Ct. 279, 58 L.Ed.2d 256 (1978), the tenth circuit held that requiring defendant to remove his boot was part of the routine duties of the customs inspectors and the search was upheld without seeking any other basis.

The ninth circuit's application of the more stringent "real suspicion" test has been limited to strip searches. It has not been required for the routine examination of outer clothing, including requiring the removal of a boot. In *United States v. Chase*, 503 F.2d 571, 574 (9th Cir. 1974), *cert. denied*, 420 U.S. 948, 95 S.Ct. 1332, 43 L.Ed.2d 427 (1975), the court explained

Since a strip search involves an embarrassing imposition upon the victim, we have reasoned, it would be unreasonable to conduct such searches without real sus-

picion. *See, e. g., Henderson v. United States*, 390 F.2d 805, 807–808 (9th Cir. 1967). Real suspicion should, therefore, limit searches only when there is a similar danger of embarrassment: where, in short, the suspect is forced to disrobe to a state which would be offensive to the average person. Judged by this standard, the removal of a boot is surely not a "strip." Rather, it is like one removing an overcoat or a suit jacket—relatively innocuous. *See Shorter v. United States*, 469 F.2d 61 (9th Cir. 1972), *cert. denied*, 411 U.S. 918, 93 S.Ct. 1555, 36 L.Ed.2d 310 (1973); *Murray v. United States*, 403 F.2d 694, 697 (9th Cir. 1968) (both: *removing a coat not a strip search*).

In a later case, the court commented that the "claim that the pat-down search should be examined by 'strip search' standards is frivolous." *United States v. Rivera-Marquez*, 519 F.2d at 1228.

In *United States v. Stornini*, 443 F.2d 833 (1st Cir.), *cert. denied*, 404 U.S. 861, 92 S.Ct. 162, 30 L.Ed.2d 104 (1971) the first circuit assumed without deciding that " 'real suspicion', i. e., one 'supported by objective articulable facts' " was required for a strip search. 443 F.2d at 834. That standard was not met. Even so, the search of Stornini was upheld because the contraband was found in his coat. The court held that a customs officer may search an individual's outer clothing, in a reasonable manner, based on subjective suspicion alone or even on a random basis.

Other courts have reached similar results. In *United States v. Yee Ngee How*, 105 F.Supp. 517 (N.D.Cal.1952), a search revealed that defendant was carrying a lump of opium in his hip pocket. Although "the search was made without a warrant and was not conducted upon the theory that petitioner was an individual under suspicion of then having opium in his possession," *id.* at 518, a motion to suppress was denied, on the grounds that it was a proper border search. The Supreme Court of Maine held that a border search of a person's pockets

could be made on "mere suspicion." *State v. Allard*, 313 A.2d 439, 451 (Me.1973).[6]

### III

We conclude that examination of a person by ordinary pat-down or frisk, the requirement that outer garments such as coat or jacket, hat or shoes be removed, that pockets, wallet or purse be emptied, are part of the routine examination of a person's effects which require no justification other than the person's decision to cross our national boundary. The single fact that such a search occurs at a border makes it reasonable within the meaning of the fourth amendment. We do not read 19 U.S.C. § 482 as requiring any suspicion other than the subjective response of a customs official who considers that the circumstances make such a search appropriate. The facts before us do not raise and our holding should not be read to reach a more intrusive search. The search of Sandler, however, was no more intrusive than the permitted routine examination described above. His motion to suppress was properly denied. His conviction is affirmed.

AFFIRMED.

RONEY, Circuit Judge, specially concurring:

I concur in the result not only because the conclusion reached by Judge Vance's opinion appears to me to be correct, but because in my judgment the facts, as a matter of law, were sufficient to support the officer's conduct judged by the reasonable suspicion standard, the outer limits of which can be defined only in terms of its application to fact situations.

R. LANIER ANDERSON, III, Circuit Judge, specially concurring:

I concur in the result reached by the majority, but only because, in my opinion, the patdown search at issue was justified by reasonable suspicion, as that test has evolved in the previous decisions of this court cited and discussed in Judge Hatchett's dissent.

Today's majority opinion applies the flexible rule of *United States v. Himmelwright*, 551 F.2d 991 (5th Cir.), *cert. denied*, 434 U.S. 902, 98 S.Ct. 298, 54 L.Ed.2d 189 (1977), and *United States v. Afanador*, 567 F.2d 1325 (5th Cir. 1978)—that the requisite justification for a search varies with the intrusiveness thereof—and merely expands by one notch those searches which require no justification. Our previous cases had held that a routine search of luggage at the border requires no justification, *United States v. Himmelwright, supra*. Today's opinion extends that holding to include a "routine patdown" search of the person, but does not address a "more intrusive search." Majority opinion, at 1169, and also footnote 5. Accordingly, such "more intrusive searches" will remain subject to the reasonable suspicion test developed in our previous cases. For the reasons expressed by Judge Hatchett, I believe that the line between "no justification necessary" and "reasonable suspicion" should be left where our previous cases had drawn it, i. e., no justification for searches of things, and the flexible reasonable suspicion test for searches of persons. I add to Judge Hatchett's reasons the fact

---

**6.** The scholarly commentators have not focused on the question of frisks. However, leaving aside those who reject the "border search" doctrine altogether, there is substantial agreement on two points: first, routine border searches require at most mere suspicion, and second, that the point at which a higher standard is invoked is at the strip or body cavity search. *See* 3 W. LaFave, Search and Seizure § 10.5 (1978); Barnett, *A Report on Search and Seizure at the Border*, 1 Am.Crim.L.Q. 36 (Aug. 1964); Ittig, *The Rites of Passage: Border Searches and the Fourth Amendment*, 40 Tenn. L.Rev. 329 (1973); Comment, *The Reasonableness of Border Searches*, 4 Cal.W.L.Rev. 355 (1968); Note, *From Bags to Body Cavities: The Law of Border Searches*, 74 Colum.L.Rev. 53 (1974); Note, *At the Border of Reasonableness: Searches by Customs Officials*, 53 Cornell L.Rev. 871 (1968); Note, *Search and Seizure at the Border—The Border Search*, 21 Rutgers L.Rev. 513 (1967); Comment, *Border Searches: An Exception To Probable Cause*, 3 St. Mary's L.J. 87 (1971); Comment, *Unwarranted Power at the Border: The Intrusive Body Search*, 32 Sw.L.J. 1005 (1978); Note, *Intrusive Border Searches—Is Judicial Control Desirable?* 115 U.Pa.L.Rev. 276 (1966); Note, *Border Searches and the Fourth Amendment*, 77 Yale L.J. 1007 (1968).

that the present line is considerably brighter than the amorphous line today drawn between routine searches, on the one hand, and more intrusive or offensive searches on the other hand.

HATCHETT, Circuit Judge, with whom TATE and WILLIAMS, Circuit Judges, join dissenting:

I dissent. The majority opinion, rather than stating a standard on an issue not previously considered, eliminates a standard that has worked well. The majority offers no compelling justification, either legal or otherwise, for rejecting the long established "reasonable suspicion" standard in favor of a vaguely defined "mere suspicion" standard. Indeed, the majority opinion would lead the uninitiated to believe that the "reasonable suspicion" standard has not long and effectively been applied in this circuit to customs area pat-down searches. The only justification that can be offered is a concern for drug smuggling. In its zeal to combat drug smuggling, a problem that may well vanish in the fullness of time, the majority does damage to the character and spirit of the fourth amendment to the Constitution of the United States. After today's decision, every international traveler, adult or child, male or female, American citizen or visitor, becomes subject to a search of the person solely upon "the subjective response of a customs official who considers that the circumstances make such a search appropriate." Majority opinion, at 1169. This new non-standard will result in abuse. Few subjected to these "routine" searches will find them "invok[ing]," as the majority opinion so reassuringly promises, "little indignity or embarrassment." Majority opinion, at 1167. Hurriedly considered, emotional responses to complicated problems do not make good law. The majority's new rule is such an example.* Never before has a federal circuit court, much less the Supreme Court, permitted a capricious, standardless search of the physical person of an American citizen returning home.

The majority confuses the search of things with the search of the person. The rights of human beings are thereby reduced to those of luggage. While law enforcement efficiency is to be lauded, if law enforcement efficiency were an end in itself, officers of the law would be free to ignore the fourth amendment entirely. Law enforcement efficiency must yield to constitutional rights; such yielding constitutes the real difference between a free society and a police state.

Prior to today's en banc pronouncement, "reasonable suspicion" was the Fifth Circuit's standard for pat-down searches in a customs area. See *United States v. Rice*, 635 F.2d 409 (5th Cir. 1981); *United States v. Klein*, 592 F.2d 909 (5th Cir. 1979); *United States v. Davis*, No. 77–5752 (5th Cir. Mar. 17, 1978) (unpublished); *United States v. Chiarito*, 507 F.2d 1098 (5th Cir.), *cert. denied*, 423 U.S. 824, 96 S.Ct. 38, 46 L.Ed.2d 40 (1975). Though the majority opinion maintains that this circuit has never "specifically addressed the standard to be applied in pat-down searches at the border," majority opinion, at 1167, the briefest of cursory perusals reveals otherwise.

For example, in *Chiarito* we stated:

After successfully passing through the baggage checkpoint, but before he exited the Customs inspection area, the appellant was stopped by a customs patrol officer escorted to an inspection room and frisked. The patrol officer found a small amount of cocaine wrapped in a dollar bill in the appellant's vest pocket. Subsequent x-rays of appellant's personal effects revealed more cocaine hidden in the heels of his shoes.

The searches conducted by customs inspectors and customs patrol officers are, of course, limited by the Fourth Amend-

---

* This sweeping change in the established interpretation of both fourth amendment principles and the applicable statute, 19 U.S.C. § 482, should not occur, if at all, without a careful and full canvass of the law of other circuits, and an opportunity for participation by the Attorney General of the United States, the organized criminal defense bar, and other interested entities.

ment's prohibition against unreasonable searches and seizures. However, in the context of searches conducted pursuant to the customs and immigration laws, the strictures of the Fourth Amendment are ameliorated by considerations attending the regulation of movement across national borders. *United States v. McDaniel*, 463 F.2d 129 (5th Cir. 1972). Stated differently, customs inspectors may predicate searches on less than the "probable cause" required in different circumstances: "Border searches are governed by the test of reasonable suspicion, rather than that of probable cause." *United States v. Maggard*, 451 F.2d 502, 504 (5th Cir. 1971). The question on appeal is, then, whether the activities of the appellant provided the patrol officer with a reasonable basis for conducting the disputed search.

*United States v. Chiarito*, at 1099 (footnote omitted).

In *Klein*, a panel of this court, in discussing a pat-down search, reviewed the law of the Fifth Circuit and found:

### II. The Patdown Search

In this Circuit, the initiation of a border search is governed by the test of "reasonable suspicion." *United States v. Himmelwright*, 5 Cir., 1977, 551 F.2d 991, *cert. denied*, 434 U.S. 902, 98 S.Ct. 298, 54 L.Ed.2d 189 (strip search); *United States v. Chiarito*, 5 Cir., 1975, 507 F.2d 1098, *cert. denied*, 423 U.S. 824, 96 S.Ct. 38, 46 L.Ed.2d 40 (frisk search); *United States v. Maggard*, 5 Cir., 1971, 451 F.2d 502, *cert. denied*, 1972, 405 U.S. 1045, 92 S.Ct. 1330, 31 L.Ed.2d 587 (car search). Whether the requisite degree of suspicion exists depends upon the totality of the circumstances of the particular case. *United States v. Lilly*, 5 Cir., 1978, 576 F.2d 1240, 1245; *United States v. Himmelwright*, 551 F.2d at 995.

*United States v. Klein* at 911 (footnotes omitted). The panel then found that "[u]nder the circumstances of this case, the above factors were sufficient to justify a request for a [pat-down] search." *Klein* at

912. In a footnote, the court concluded that "[t]he initial pat-down, which triggered the further investigation, is the search upon which the Fourth Amendment issue turns." *Id.* at n.6. The panel then ultimately concluded that "[b]ecause we find that there was sufficient 'reasonable suspicion' to justify the initial search, and because we find that the conduct of the search was also reasonable, we hold that there was no Fourth Amendment violation in this case." *Id.* at 912–13.

Just a few months ago, in *United States v. Rice*, 635 F.2d 409 (5th Cir. 1981), we determined that:

The visual inspection of appellant's leg by customs officer Magonigle at the Miami International Airport was a search of the person conducted at the border. *United States v. Klein*, 592 F.2d 909, 911 n.1 (5th Cir. 1979). Such a search may be constitutionally justified on less than probable cause. *United States v. Himmelwright*, 551 F.2d 991, 994 (5th Cir.), *cert. denied*, 434 U.S. 902, 98 S.Ct. 298, 54 L.Ed.2d 189 (1977). We indicated in *United States v. Klein, supra*, where a patdown search of appellant at the Miami International Airport was challenged as violative of the Fourth Amendment, that "[i]n this circuit the initiation of a border search is governed by the test of reasonable suspicion. [citations omitted] Whether the requisite degree of suspicion exists depends upon the totality of the circumstances of the particular case. [citations omitted]."

. . . .

The search at issue here was more intrusive than a routine search of luggage at the border (which requires no articulable suspicion under *United States v. Himmelwright*, 551 F.2d 991 (5th Cir. 1977)) and less intrusive than a full strip search (with its standard of reasonable suspicion as applied, for example, in *United States v. Himmelwright*, 551 F.2d 991 (5th Cir. 1977) and *United States v. Afanador*, 567 F.2d 1325 (5th Cir. 1978)). Although the search in *United States v. Klein, supra*, with respect to which this court found

there was reasonable suspicion, involved a patdown of the armpit area of a male passenger, while the instant search involved the baring and visual inspection of the lower leg area of a female passenger, we think that the intrusiveness of the two searches is somewhat comparable. In *Klein*, there was tactile contact of an area of the male body which is often exposed; in this case, there was visual inspection only of an area of the female body which is ordinarily exposed.

We conclude, however, that the search involved in the instant case—the visual inspection of appellant's leg below the knee after a request that she lift her slacks leg—was a minimally intrusive search of appellant's person. Assuming that the search here requires some articulable suspicion that criminal action was afoot, we conclude that such suspicion was present. Customs officer Magonigle observed that appellant's lower leg between her knee and ankle was unusually bulky. He observed that her traveling companion also had an unusually bulky lower leg. Magonigle's observations were sufficient to create the requisite reasonable suspicion needed to justify his visual inspection of appellant's lower leg. Our holding is confined to the circumstances presented by this case.

We hold in addition that the visual inspection of appellant's lower leg was conducted in a reasonable manner. *United States v. Klein*, 592 F.2d 909, 912–913 (5th Cir. 1979). We conclude, therefore, that there was no Fourth Amendment violation in this case.

*United States v. Rice*, at 409–10.

This review of the "reasonable suspicion" standard vis-a-vis pat-down searches is revealing for another reason. It clearly establishes that the dictum, relied on by the majority, from *United States v. Skipwith*, 482 F.2d at 1276 (5th Cir. 1973), "those who actually present themselves for boarding on an air carrier, like those seeking entrance into the contrary, are subject to a search based on mere or unsupported suspicion," constituted an incorrect statement of the applicable search standard for those entering the country. *See, e. g., United States v. Maggard*, 451 F.2d 502 (5th Cir. 1971), *cert. denied*, 405 U.S. 1045, 92 S.Ct. 1330, 31 L.Ed.2d 587 (1972) (applying reasonable suspicion standard). Accordingly, *Skipwith* cannot reasonably be used to justify the majority's switch from the "reasonable suspicion" standard to the "mere suspicion" standard.

Yet today's decision replaces the "reasonable suspicion" standard with a "mere suspicion" test without explicitly overruling contrary precedent. Certainly it is the prerogative of the en banc court to reject and adopt applicable standards as it sees fit. But today's action cannot be justified by suggesting that the question is one of first impression. Demonstrably, such is not the case.

Nor can the majority opinion find justification, or anything more than dicta, from Supreme Court decisions. The majority begins its attempt at justification by stating that the policy behind the principle of "mere suspicion" searches of persons was first articulated in *Carroll v. United States*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925). *Carroll*, however, was not a border search case. *Carroll* involved a non-border vehicle search for illegal alcohol. The language quoted by the majority was mere dictum. Further, the searches, discussed by the *Carroll* Court were specifically limited to searches of automobiles and belongings. Even the dictum quoted by the majority did not apply to the search of persons. In the Supreme Court's own words a "narrow exception to the warrant requirement was first established in *Carroll v. United States*. The Court in *Carroll* approved a portion of the Volstead Act providing for warrantless searches of automobiles when there was probable cause to believe they contained illegal alcoholic beverages." *Almeida-Sanchez v. United States*, 413 U.S. 266, 269, 93 S.Ct. 2535, 2537, 37 L.Ed.2d 596 (1973) (citations omitted).

While it is proper that interests of national self-protection allow border searches to rest on different standards of constitutional

law than do domestic searches, the Supreme Court has never intimated, much less explicitly stated, that the fourth amendment has no applicability to border searches. Yet the majority effectively eliminates any fourth amendment concerns by holding that a pat-down search requires "no justification other than the person's decision to cross our national boundary." Majority opinion, slip. op. at 1169.

Because no Supreme Court decision justifies the majority's holding, the majority attempts to buttress its break with Fifth Circuit precedent by reference to dicta in cases involving: the importation of obscene materials, *United States v. 12 200–Ft. Reels of Super 8MM. Film*, 413 U.S. 123, 93 S.Ct. 2665, 37 L.Ed.2d 500 (1973); a Border Patrol immigration search of a vehicle, *Almeida-Sanchez v. United States*, 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973); a Border Patrol immigration stop of a vehicle to question, not search, its occupants, *United States v. Brignoni-Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975); and a border search of international mail where the customs inspector had reasonable cause to suspect the mail contained contraband, *United States v. Ramsey*, 431 U.S. 606, 97 S.Ct. 1972, 52 L.Ed.2d 612 (1977).

With reference to one of the majority's principal cases, the *Almeida-Sanchez* decision, it is appropriate to remember the distinction articulated by concurring Justice Powell that "these are searches of automobiles rather than searches of persons or buildings. The search of an automobile is far less intrusive on the rights protected by the Fourth Amendment than the search of one's person ...." 413 U.S. at 279, 93 S.Ct. at 2542. The majority denies any distinction between persons and things, however, and pointedly equates a personal pat-down to a luggage search: "we think that [a pat-down] is no worse than having a stranger rummage through one's luggage, a practice which is clearly acceptable." Majority opinion, slip op. at 1167. The only limitation that the majority places on such searches is that the customs official may not have the person stripped, beyond the shoes and outer garments, without some

suspicion. This search of the person is termed "routine." That such a conclusion directly contravenes past Fifth Circuit holdings, *see, e. g., United States v. Rice*, 635 F.2d 409 (5th Cir. 1981), apparently does not concern the majority, for, as previously stated, nowhere does the majority overrule contrary cases.

The majority also makes uncustomary use of *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), noting that the Supreme Court allows a frisk to be conducted on a public street. While this is true, the frisk in *Terry* was limited to a search for weapons based on "reasonable suspicion." *Almeida-Sanchez*; *Adams v. Williams*, 407 U.S. 143, 92 S.Ct. 670, 30 L.Ed.2d 661 (1972); *Terry v. Ohio*. Additionally, it is straining to imply that because frisks are permitted on public streets their innocuous quality is somehow established. The majority loses sight of the fact that the *Terry* Court allowed public street frisks, subject to stringent limitations, only to protect police from possible harm by armed criminals.

The majority's holding can only be explained as acquiescence to the current short-sighted demand for an easy answer to the complicated drug problem. Reducing fourth amendment freedoms, however, to the status of second-class rights is not going to eliminate the drug problem. Aside from the obvious fact that the root causes of the drug problem are not of constitutional origin, it is equally obvious that the overwhelming majority of illegal drugs brought into this country do not arrive via scheduled commercial transportation. Nearly always, drugs arrive in a more surreptitious nature. With today's decision, one can logically conclude that never before have so many been subjected to so much for so little. Further, the "reasonable suspicion" standard did not constitute an impediment to customs officials. Prior to the panel decision in *Sandler*, as pointed out in the panel dissent, sufficient "reasonable suspicion" was found to uphold every pat-down search conducted by custom officials in the Fifth Circuit. The "reasonable suspicion" standard thus allowed for efficient law enforcement and

preserved the individual's fourth amendment rights.

Today's decision not only ignores firmly established precedent; it also gives custom officials the arbitrary authority, justified solely by border location, to search travelers, the majority of whom will be American citizens, based on the custom official's random, discriminatory, subjective response. This subjective response will not later undergo judicial scrutiny. Henceforth, the fourth amendment will apply only to the most intrusive strip and body cavity searches. I protest, as did Justice Jackson when he declared:

These [fourth amendment rights], I protest, are not mere second-class rights but belong in the catalog of indispensable freedoms. Among deprivations of rights, none is so effective in cowing a population, crushing the spirit of the individual and putting terror in every heart. Uncontrolled search and seizure is one of the first and most effective weapons in the arsenal of every arbitrary government.

*Brinegar v. United States*, 338 U.S. 160, 180, 69 S.Ct. 1302, 1313, 93 L.Ed. 1879 (1949) (Jackson, J., dissenting).