**AMERICAN SAMOA GOVERNMENT, Plaintiff,**

v.

**FA`ATOIAALEMANU VAGAVAO, Defendant.**

High Court of American Samoa
Trial Division

CR No. 78-98

February 4, 1999

Before KRUSE, Chief Justice, AFUOLA, Associate Judge, and SAGAPOLUTELE, Associate Judge.

Counsel: For Plaintiff, John W. Cassell, Assistant Attorney General
        For Defendant, Tautai A.F. Fa`alevao, Public Defender

## ORDER DENYING MOTION TO SUPPRESS EVIDENCE

On the morning of October 15, 1998, defendant Fa`atoiaalemanu Vagavao ("Vagavao") was arrested, and was subsequently charged with one count of possession of marijuana, a controlled substance, in violation of A.S.C.A. §§ 13.1022 and 13.1006, a class D Felony punishable by imprisonment for up to five years and/or a fine of up to five thousand dollars. Following waiver of the preliminary examination, Vagavao was arraigned in the High Court on December 1, 1998, and a jury trial was scheduled for March 16, 1999. On January 11, 1999, defendant filed a motion to suppress evidence pursuant to Rule 12(b)(3) of the Trial Court Rules of Criminal Procedure, seeking to suppress both the physical evidence obtained in, the search and the subsequent sworn statement made by the defendant. A hearing was held on the motion on January 26, 1999, with the defendant and all counsel present.

## Facts

On the morning of October 15, 1998, Vagavao was a passenger on the inter-island ferry *Queen Salamasina,* entering the Territory from Apia, Independent Samoa. Customs Agent Pauulu Lagai, who testified at the January 26 hearing, was on duty that morning. (While the defendant challenges the legal implications of the basic facts regarding his search, he did not at the hearing dispute the particulars of Agent Lagai's account of events leading up to his arrest.)

According to Agent Lagai, Vagavao approached his customs counter at approximately 7:30 a.m. and presented his carry-on baggage for inspection. Agent Lagai testified that the defendant typically visited the Territory, frequently, with family members for the purpose of selling agricultural products, and would invariably depart on the Salamasina's return voyage the very same day. On the day in question, however, agent Lagai noted that the defendant was traveling alone with only a hand bag and apparently without cargo for sale. Agent Lagai also noticed that Vagavao was wearing oversized clothing in the way of baggy shorts and an untucked t-shirt, clothing he knew to be typical for concealing contraband. Based primarily on these two factors, Agent Lagai asked the defendant to raise his shirt to allow for visual inspection of the waistband.[1] When Vagavao complied only partially, failing to lift his shirt sufficiently for the stated purpose, Agent Lagai then directed him to a private secondary search area.

In the secondary search area, Vagavao removed his shirt without instruction to do so, and Agent Lagai conducted a "pat down" search involving a frisk of defendant's outer clothing. While doing so, he felt several unusual bulges throughout the crotch area. Upon discovery of the bulges, defendant whispered the word "fa`amolemole" (please) to Agent Lagai, who nonetheless instructed the defendant to remove the remainder of his clothing. The strip search then revealed that Vagavao was wearing two pairs of shorts in addition to his underwear. Furthermore, in the course of conducting the search, Agent Lagai ultimately uncovered approximately thirty small bundles of what was later confirmed to be marijuana. The police were duly summoned to the scene, and Vagavao was taken into custody shortly thereafter.

As with the search discussed above, the basic facts surrounding Vagavao's statement to the police remain essentially uncontested. At the hearing, Captain Va`aomala Sunia testified that the defendant was fully advised of his constitutional rights twice prior to taking him to the police station. At the station, immediately prior to offering his written statement, Vagavao was advised of his constitutional rights for a third time. As Captain Sunia walked him through the standard police form, defendant placed his initials next to each statement to indicate that he

---

[1] Agent Lagai had also received a tip that defendant had engaged in smuggling and might attempt to introduce contraband into the Territory. However, he conceded at the hearing that this tip did not come from a reliable source, and asserted that it was not a significant reason behind his actions that morning. For these reasons, we disregard this evidence and the discussion below will, accordingly, analyze whether those other reasons cited by Agent Lagai were *independently* sufficient to justify the search of defendant's person. Mere heightened awareness which may have resulted from the tip will not doom an otherwise valid search.

understood those rights and nevertheless wished to proceed with his statement. Both the verbal and written warnings of defendant's constitutional rights were in Samoan, which the defendant does not dispute to be his native language.

## Discussion

A. Evidence Seized in Border Searches

Article I, Section 5 of the Revised Constitution of American Samoa affords, to all individuals certain protections against unreasonable searches and seizures by the government. Those exact same protections are, in relevant part, also guaranteed by the Fourth Amendment to the U.S. Constitution. The United States Supreme Court has made it clear that a "border search" of the type at issue in this case may be subject to a significantly less demanding standard than that required for searches within the interior. *United States v. Montoya de Hernandez,* 473 U.S. 531 (1985). To conclude that a given search is legal—and therefore the evidentiary "fruits" of that search admissible—a court must determine that the inspecting officer met a certain threshold level of suspicion supportable by objective facts confronting that officer at the time of the search. To further complicate matters, the court is here faced with two distinct searches, each with its own varying standards of suspicion as articulated by different federal circuit courts. The first consisted of the "pat down" search over the defendant's clothing; the second, of course, was the strip search which followed Agent Lagai's discovery of the unusual bulges.

The law regarding a border pat down search remains unsettled, with circuit courts requiring anything from little or no suspicion whatsoever (analogizing the pat down to a routine search of luggage) to "minimal suspicion" to "some suspicion." *United States v. Sandler,* 644 F.2d 1163 (5th Cir. 1981); *United States v. Vance,* 62 F.3d 1152 (9th Cir. 1995); *United States v. Dorsey,* 641 F.2d 1213 (7th Cir. 1981). We agree with the government, however, in concluding that the instant case does not require us to parse the fine distinctions posed by these assorted standards. In our opinion, all of the above suggest a very low standard, requiring only the articulation of some facts which would lead a reasonable and objective customs officer to believe the search to be necessary. Agent Lagai certainly met this minimal standard, noting the defendant's deviation from his typical travel patterns,[2] his baggy clothing

---

[2] In *Vance,* the Ninth Circuit noted, among other factors, that agents "had observed that [the defendant's] trip was too short to make sense." 62 F.3d 1152, 1156 (1995). Similarly, Agent Lagai noticed that Vagavao was scheduled to return the same day and therefore likely was not on vacation; at the same time, Lagai also saw that the defendant did not

which could enable the concealment of contraband,[3] and his initial refusal to comply fully with the request that he lift his shirt for visual inspection of the waistband. All of these factors indicate that the pat down search was not conducted arbitrarily, but rather was based on the sum of these several observations made by a trained customs officer.

█ Like the standards for a pat down, the requirements for a border strip search vary from circuit to circuit, although all agree that the increased intrusiveness of this type of search requires a heightened level of suspicion. The Ninth Circuit favors a showing of "real suspicion"; the Fifth requires "reasonable suspicion." *United States v. Vance,* 62 F.3d 1152 (9th Cir. 1995); *United States v. Adekunle,* 980 F.2d 985 (5th Cir. 1992). *See also United States v. Guadalupe-Garza,* 421 F.2d 876 (9th Cir. 1970) (requiring a showing that "objective, articulable facts must bear some reasonable relationship to suspicion that something is concealed on the body of the person to be searched"). However, we again do not find it necessary to adopt one or the other, as we believe the facts in this case satisfy even the most stringent of those accepted tests. In addition to those facts already mentioned, the discovery during the pat down search of unusual bulges, coupled with the defendant's plaintive "please," all would lead a rational person—much less a trained customs officer—to reasonably conclude that Vagavao was likely to be smuggling contraband into American Samoa.[4]

█ We conclude that both the pat down and strip searches of Vagavao were legal and not violative of the defendant's rights against unreasonable search. We take this opportunity to emphasize the important role that territorial customs officials play in protecting our islands from the infusion of illegal drugs and other such undesirable imports. Except as required by law in determining whether a minimum threshold level of suspicion is met, this court will not as a general rule

---

travel with his usual cargo which would signify his intent to engage in business. Taken together, these two observations suggest, at the very least, a reasonable question as to the motives for Vagavao's visit to American Samoa.

[3] The Eleventh Circuit held a border search to be valid when one factor considered by agents prior to the search was that the defendant "was dressed in clothes typical of undocumented aliens" and that the 12-passenger van driven by the defendant was "typical of those that transport large numbers of undocumented aliens." *United States v. Cruz-Hernandez,* 62 F.3d 1353 (1995).

[4] Like Vagavao, the defendant in *Vance* was wearing an additional layer of underclothes in a "tropical climate," and the agent had recognized a "suspicious bulge under his pants." These factors were critical to the court's determination that the search was properly based on "real suspicion." 62 F.3d 1152, 1156 (9th Cir. 1995).

attempt to substitute its own judgment for that of trained, experienced customs officers., The Searches of, the defendant in this case are held to be valid, and any evidence obtained therefrom may properly be introduced at trial.

## B. Defendant's Sworn Statement

The landmark case of *Miranda v. Arizona* set forth the constitutional requirements for advising a defendant of his legal rights prior to custodial interrogation. 384 U.S. 436, 444-5 (1966). While a line of subsequent cases has further refined those procedures, none have required anything beyond the steps taken by Captain Sunia on the morning of October 15, 1998. At the hearing he testified that he advised Vagavao of his rights a total of three times, including the last which was acknowledged in writing by the defendant.

■ Each time the *Miranda* warnings were administered, the defendant responded that he understood his rights. The defendant has made no attempt to refute these basic facts. Instead, he merely hinted via cross-examination that Vagavao perhaps had not *actually* fully understood his rights—particularly his right to have an attorney present during interrogation—despite his answer to the contrary. Much as we may support a criminal defendant's absolute right to counsel, however, we cannot impose upon the police the requirement that they look beyond a defendant's own words and presume that he does not comprehend the plain language of *Miranda*. We therefore hold that Vagavao's statements were properly obtained and such statements will, accordingly, be deemed admissible at trial.

## Order

For the foregoing reasons, defendant's motion to suppress evidence is denied.

It is so ordered.